[No. B230768. Second Dist., Div. Two. Aug. 23, 2012.]

In re the Marriage of ANDREA NICOLE and ANDREW EDWARD LEFT.
ANDREA NICOLE LEFT, Respondent, v.
ANDREW EDWARD LEFT, Appellant.

1138

Gary J. Cohen for Appellant.

Honey Kessler Amado and Erin M. Bogle for Respondent.

OPINION

**CHAVEZ, J.**—This matter arises out of dissolution of marriage proceedings between Andrew Edward Left (Andrew) and Andrea Nicole Left (Andrea).[1] On February 7, 2007, the parties entered into a stipulation providing for Andrew to pay spousal support to Andrea in the amount of $32,547 per month and child support in the amount of $14,590 per month. A judgment of dissolution, as to status only, was entered on June 30, 2008. On October 19, 2009, Andrew filed an order to show cause (OSC) application to terminate spousal support, on the primary ground that Andrea had remarried. Andrea filed a competing OSC application for contempt, on the ground that Andrew had failed to pay spousal support. Andrew appeals from the trial court's order

---

[1] To avoid confusion and follow the convention in family law appeals, the parties will be referred to by their first names.

denying his application to terminate spousal support and modifying the spousal and child support orders. We affirm.

## CONTENTIONS

Andrew contends that the trial court erred in determining that the ceremony that Andrea participated in with Dr. Todd Katzman (Todd) did not constitute a remarriage under Family Code section 4337.[2] Further, Andrew contends, even if the ceremony did not constitute a remarriage under section 4337, Andrea should be estopped from denying that she has remarried. In addition, Andrew argues, by giving little or no weight to the short duration of the parties' marriage, the trial court abused its discretion in declining to terminate spousal support.

As to the modification of the spousal support order, Andrew contends that the trial court erred by refusing to make the modification retroactive to a date prior to May 2010, when Andrew filed an updated income and expense declaration.

As to the modification of the child support order, Andrew argues that the trial court erroneously reserved jurisdiction to adjust the start date for the new child support order. Andrew requests that any references to the court's reservation of jurisdiction on this issue be stricken.

## BACKGROUND

1. *The marriage and divorce*

Andrea and Andrew were married in June 2001 and separated in February 2006. Andrew is a stock trader. Andrea was a practicing attorney before the marriage and early in the marriage, but she stopped working when she became pregnant in 2001. During the marriage, Andrea did not work outside the home. There are two minor children of the parties' marriage: Jordan, age eight, and Lauren, age seven.

On November 18, 2005, Andrea filed a petition for dissolution of marriage. Andrew filed his response on June 3, 2008.

In December 2006, Andrea filed an OSC application for relief, including temporary child support and spousal support. On February 7, 2007, the parties entered into a stipulation under which Andrew agreed to pay child support of $14,590 per month and spousal support of $32,547 per month.

---

[2] All further statutory references are to the Family Code unless otherwise indicated.

As of mid-2008, there had not yet been an adjudication of contested issues. A judgment of dissolution, status only, was entered on June 30, 2008. The ruling dissolved the marriage, but the court reserved jurisdiction over all other issues.

## 2. *Andrea's commitment ceremony*

At the end of December 2008, Andrea became engaged to marry Todd. At the time that she set the date for her wedding, Andrea believed that she and Andrew would have their issues resolved. Andrea and Todd set their wedding date for May 2, 2009, and sent out wedding invitations in early March 2009. They began living together in February or March 2009.

Andrea switched custodial weekends with Andrew so that the children could attend the ceremony. She also advised her children's school that she was getting married and would be away on her honeymoon. She and Todd were registered at Bloomingdale's for gifts.

According to Andrea, in the weeks before the wedding, it became clear that she and Andrew would not be able to resolve the remaining issues regarding the divorce. Neither she nor Todd was comfortable going forward with the wedding while the litigation with Andrew was unresolved. Andrea stated that she did not want Todd entangled in her divorce. However, because they had sent out invitations for a May 2, 2009 ceremony and had spent money on planned activities, they wanted to proceed with the celebration.

On May 2, 2009, the celebration took place in Palm Springs. Andrea testified that she would call the event a "commitment ceremony." She wore her wedding dress, and she wanted the children to believe that she was getting married. She and Todd signed a ketubah, which is a Jewish marriage contract. However, Andrea and Todd did not obtain a marriage license.

According to Rabbi Haim Asa, who presided over the ceremony, when he arrived in Palm Springs he believed he was going to preside over a wedding. Approximately 30 minutes before the ceremony, when Rabbi Asa would normally have had the parties sign the marriage certificate, he learned that there was a problem getting the license. Rabbi Asa did not inform the guests that he was not performing a wedding. Indeed, the guests who testified stated that at the time of the ceremony they believed Andrea and Todd had actually gotten married. Rabbi Asa called Andrea and Todd every month following the ceremony to see whether they had obtained a civil license yet.

On June 24, 2009, Andrea informed Andrew that she and Todd were not really married. On July 31, 2009, Andrew confirmed that he knew they were not married.

### 3. *Andrew's OSC to terminate or reduce spousal support*

Andrew filed his OSC to terminate spousal support on October 19, 2009. The primary ground for the application was Andrea's remarriage to Todd. In the alternative, Andrew requested termination based on a combination of factors: (1) the marriage was one of short duration; (2) Andrew had already paid spousal support to Andrea for over three years, which represented nearly three-fourths the length of the marriage; (3) Andrea had a law degree, yet had made no effort to support herself; and (4) Andrea was cohabitating with Todd.

### 4. *Andrea's application for writ of execution and OSC for contempt*

The day after Andrew filed his OSC to terminate spousal support, Andrea filed an application for writ of execution, claiming that Andrew owed her $247,666.86 in past due support, plus accrued interest and costs. The application for writ of execution encompassed payments due between December 2008 and October 2009. A writ was issued the same day.

On November 5, 2009, Andrea filed an OSC for contempt based on Andrew's failure to pay the full amount of child and spousal support each month, for a time period beginning in December 2008.

The parties appeared in court on December 1, 2009. The court set the contempt OSC hearing for January 13, 2010. The court ordered Andrew's OSC regarding termination of spousal support to trail behind the contempt proceeding, and stayed Andrew's obligation to pay spousal support until his OSC could be heard. The court made it clear that it needed "a current and updated income and expense declaration under California Rule[s] of Court[, rule] 5.128" before it could consider the issues raised in Andrew's OSC. The court specified that Andrew was not required to respond to any "financial issue OSC until after the resolution of the contempt."

On December 28, 2009, $255,000 was garnished from Andrew's E*Trade account pursuant to the writ of execution issued on October 20, 2009. Andrew filed an ex parte application to stay disbursement of the funds. The parties thereafter entered into a stipulation pursuant to which the $255,000 was disbursed to Andrea's counsel to be held in trust pending further order of the court.

Trial of the contempt matter commenced on January 28, 2010, and continued on February 8, February 11, March 29, and April 20, 2011. The court made it clear that all testimony regarding both the OSC for contempt and Andrew's OSC for termination of support should be brought forth, so that the witnesses would not have to testify twice.

On April 30, 2010, the court found Andrew guilty of nine of the 10 counts of contempt.

## 5. *Andrea's OSC to amend the 2007 stipulation*

On May 4, 2010, Andrea filed an OSC to amend the 2007 stipulation regarding child and spousal support nunc pro tunc, or, in the alternative, for an immediate disbursement of the community property due under paragraph 750.3 of the stipulation.[3] Andrea sought this relief on the ground that Andrew's earnings were substantially more than he had disclosed at the time of the stipulation and that support should be modified to be commensurate with his actual earnings.

Andrew filed a response to Andrea's OSC. Andrew argued that the trial court did not have jurisdiction to retroactively amend the February 7, 2007 stipulation and order. He also argued that by agreeing that any income over $1.5 million in 2007 would be deemed community property, the parties made this a property issue for trial. Andrew argued that Andrea was seeking an early distribution of community property, and that any such payment should only be considered with a calculation of the community taxes that Andrew has paid on that money. In addition, Andrew pointed out that he had recently tendered a check to Andrea in the amount of $400,000 while the calculation of Andrew's excess income and the associated tax liability from 2007 was being calculated. Finally, Andrew argued that Andrea was not entitled to spousal support in an amount that far exceeds the marital standard of living.

## 6. *Andrew's updated income and expense declaration*

On May 5, 2010, Andrew filed an updated income and expense declaration. The declaration indicated that for the 12 months ending February 28, 2010, Andrew's trading activities resulted in a $2,242,576 loss, an average loss of $186,881 per month.

---

[3] Paragraph 750.3 of the stipulation provides: "The orders presume that [Andrew] will generate income from said trading of $1.5 [million] annually. Any income in the accounts up to $1.5 [million] annually (1/07–2/07) shall be [Andrew's] income from which he shall pay the support, and [Andrew] shall pay all federal and state tax liability therein and shall indemnify and hold [Andrea] harmless therefrom. To the extent that income is realized in excess of $1.5 [million] for 2007, the excess income is comm[unity] prop[erty]. Each party shall be responsible for and pay the federal and state tax on the income in excess of $1.5 [million]. The court reserves jurisdiction with regard to the distribution of any excess income."

### 7. Rulings on the requests to modify support

On June 1, 2010, the parties appeared and presented argument concerning both Andrew's OSC for termination of spousal support and Andrea's OSC to amend the February 7, 2007 stipulation and order nunc pro tunc. The matter was submitted.

On September 14, 2010, the trial court filed a ruling on the submitted matter. The court held that Andrea was not remarried, therefore the "non-marriage ceremony several months ago has no real effect on the support award." Regarding Andrea's cohabitation with Todd, the court found the cohabitation to be grounds for reducing the support award, and accordingly reduced Andrea's spousal support from $32,547 per month to $20,000 per month.

Although Andrew wanted the order to be retroactive to May 2009, the date of Andrea's commitment ceremony, the court limited the retroactive application of the order to May 15, 2010. The court noted that Andrew did not file an income and expense declaration (Judicial Council form FL-150) until May 9, 2010. Based on the filing date of Andrew's form FL-150, the court stated that it could "only go back in time to May 15, 2010 in modifying support. [Andrew] cannot fail to comply with the court's filing requirements and gain the time advantage of a retroactive modification date."

The court increased the amount of child support from $14,590 per month to $19,075 per month. As to the start date for this modification, the court stated: "[Andrew] requested that the child support reach back to the February 2007 support award. The court will reserve over that start date, but will not reach back that far. The court is uncertain at this point as to what the actual amount [Andrew] has now paid [Andrea] for the community portion of 2007, forward to the extent that there is any community portion after the 2007 calendar year. At the present time, the court will start the new child support amount on May 15, 2010, the date appropriate as a result of the filing date."

The ruling on submitted matter directed Andrea's counsel to draft an order for the trial court's signature. Andrea's counsel served a proposed order on October 20, 2010. The trial court revised the order, signed it, and filed it on December 16, 2010.

On February 7, 2011, Andrew filed his notice of appeal.

## DISCUSSION

### I. *Remarriage*

Andrew's main argument on appeal involves the ceremony which took place on May 2, 2009, between Andrea and Todd. Andrew argues that the trial court misinterpreted section 4337 and decisional law in finding that Andrea had not remarried as that term is used in section 4337. As set forth below, we find that no error occurred.

#### A. *Standard of review*

Normally, an order modifying spousal support is reviewed under the deferential abuse of discretion standard. (*In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 93 [91 Cal.Rptr.2d 374] (*Kerr*).) However, where the appeal raises a question regarding the proper interpretation of a statute, or the proper application of the law to uncontested facts, the standard of review is de novo. (*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 506–507 [38 Cal.Rptr.3d 908] (*Campbell*).) We therefore analyze Andrew's question regarding the proper application of section 4337, and its application to the facts of this case, de novo.

#### B. *Section 4337 does not apply*

Andrew argues that on May 2, 2009, Andrea remarried, thus terminating Andrew's support obligations pursuant to section 4337. Section 4337 provides: "Except as otherwise agreed by the parties in writing, the obligation of a party under an order for the support of the other party terminates upon the death of either party or the remarriage of the other party."

■ We begin our analysis by examining the statute's words, giving them a plain and commonsense meaning. (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].) Neither party argues that the word "remarriage," as used in the statute, is ambiguous. ■ We find that the word is clear and unambiguous, and requires entry into a legal marriage.

■ In California, there are several requirements for a valid marriage. The parties must consent to the marriage; consent must be followed by the issuance of a license; and the marriage must be solemnized by an authorized person. (§§ 300, 400.) In addition, the parties must declare, in the presence of the person solemnizing the marriage, that they take each other as husband and wife. (§ 420.)

The record shows that Andrea and Todd did not become legally married at the commitment ceremony on May 2, 2009. No marriage license was issued.

Rabbi Asa, who presided over the ceremony, was aware that the parties did not have a marriage license. Andrea and Todd did not enter into a valid marriage under California law.

Andrew concedes that Andrea and Todd did not enter into a legally valid marriage under California law.[4] However, he argues that section 4337 and its predecessors have been interpreted to include a ceremony that resembles a valid remarriage—regardless of whether the ceremony resulted in a valid marriage. In support of his position, Andrew cites three cases: *Sefton v. Sefton* (1955) 45 Cal.2d 872 [291 P.2d 439] *(Sefton)*; *Berkely v. Berkely* (1969) 269 Cal.App.2d 872 [75 Cal.Rptr. 294] *(Berkely)*; and *Fry v. Fry* (1970) 5 Cal.App.3d 169, 170–171 [85 Cal.Rptr. 126] *(Fry)*. Andrew argues that these three cases show that it has been clear for decades that a ceremonial marriage, whether valid, void, or voidable, represents a "remarriage" as that term has been used in section 4337 and its predecessors.

In *Sefton*, the Supreme Court interpreted Civil Code former section 139.[5] The Seftons had obtained a final divorce decree in December 1951, which obligated Mr. Sefton to pay Mrs. Sefton spousal support until the death or remarriage of Mrs. Sefton. Mr. Sefton paid the support through June 5, 1953. On June 12, 1953, Mrs. Sefton entered into a ceremonial marriage with Ross C. Marble. Thereafter she commenced an action to annul her marriage to Mr. Marble, for a species of fraud which would make the marriage voidable. On June 19, 1953, Mrs. Sefton's marriage to Mr. Marble was decreed null and void. *(Sefton, supra,* 45 Cal.2d at p. 874.) The issue on appeal was "whether the annulment decree effectively revived the defendant's obligation to pay alimony, or whether Mrs. Sefton's voidable marriage to Marble was a 'remarriage' within the meaning of that term as employed in section 139 . . . ." *(Ibid.)* The court held that when considering the rights of Mr. Sefton, the annulment decree did not relate back and erase the marriage. The court reasoned: "By the celebration of marriage [Mrs. Sefton] held herself out as having remarried. The defendant was entitled to rely upon her apparent marital status after the ceremony. If Mrs. Sefton's new marriage was subject to annulment for fraud . . . the marriage would be voidable only. . . . The divorced spouse, the defendant here, may never know of the circumstances which make his former wife's new marriage voidable. . . . After the ceremony took place he could properly assume, in accordance with [Civil Code] section 139 and the property settlement agreement, that his obligation

---

[4] Since it is undisputed that Andrea and Todd did not enter into a legally valid marriage due to their failure to obtain a marriage license, we decline to discuss the elements of consent and solemnization.

[5] The statute, which was very similar to the current section 4337, provided: " 'Except as otherwise agreed by the parties in writing, the obligation of any party in any decree, judgment or order for the support and maintenance of the other party shall terminate upon the death of the obligor or upon the remarriage of the other party.' " *(Sefton, supra,* 45 Cal.2d at p. 874.)

to pay alimony had ceased. He was then entitled to recommit his assets previously chargeable to alimony to other purposes. Under such circumstances it would be improper to reinstate his alimony obligation." (*Sefton*, at pp. 876–877.)

The *Sefton* case discusses reinstatement of alimony payments after the annulment of a remarriage. In contrast to the present matter, the defendant had ceased making payments, and his former wife was suing to have the payments reinstated. There was no question as to whether the legal requirements of marriage—including a marriage license—had been met. In fact, Mrs. Sefton's marriage was only considered to be voidable at the election of one of the parties—not invalid entirely. Here, in contrast, Andrew seeks termination of payments on the ground of remarriage, where the parties agree that the legal requirements of marriage have not been met. In sum, *Sefton* does not support Andrew's position here.

*Berkely* also involved an action to reinstate payment of alimony after an annulled remarriage. The plaintiff, Norma Berkely, had remarried a few months after her divorce. About six months later, she received an annulment decree on the ground that a prior existing marriage of her new husband rendered his marriage to her bigamous and void. (*Berkely, supra,* 269 Cal.App.2d at p. 872.) The court declined to reinstate Mr. Berkely's alimony payments. Citing *Sefton*, the court reasoned that the same holding applies with equal force to a void marriage (*Berkely*, at p. 874), and found no persuasive reason to distinguish between "the effects upon alimony of a void and a voidable remarriage." (*Id.* at p. 875.) The court noted that a divorcee should be treated "as a responsible person who must be held to her decision, presumably relied upon by others, to terminate her right to support from a former husband." (*Ibid.*) Here, the parties agree, Andrea made no decision to legally marry. Her commitment ceremony was not a void or voidable remarriage—it was not a marriage at all.

*Fry* involved facts almost identical to *Berkely*. The plaintiff, who was receiving alimony payments from her former husband, entered into a bigamous remarriage which was later annulled and declared void. The sole question on appeal was whether the remarriage, later declared void by the court, extinguished the plaintiff's right to further alimony. Following the authority of *Sefton* and *Berkely*, the *Fry* court concluded that it did.

Neither *Sefton, Berkely* nor *Fry* involved a situation where, as here, the parties did not intend to legally marry, did not obtain a marriage license, and purposely did not carry out the legal requirements of marriage. Contrary to Andrew's position, these cases do not stand for the proposition that the term "remarriage," as used in section 4337, applies to a ceremony such as the one undertaken by Andrea and Todd.

Andrea points to *Campbell* which held that the term "remarriage," as set forth in section 4337, does not include a supported spouse's attempt to remarry prior to judgment dissolving the marriage. In *Campbell*, the dissolution action of Eric and Rebekah Campbell was still pending when Rebekah Campbell was remarried in Nevada. The remarriage, of course, was void, since Rebekah was still married to Eric. (*Campbell, supra*, 136 Cal.App.4th at p. 504.) The trial court denied Eric's motion to terminate spousal support, and the Court of Appeal agreed, explaining that "a person may *never* legally remarry prior to dissolution of his or her existing marriage." (*Id.* at p. 508.)[6] Thus, the Court of Appeal concluded, "it is reasonable to conclude that the Legislature never expected nor intended that 'remarriage,' within the meaning of section 4337, would encompass an attempted remarriage prior to dissolution of the first marriage." (*Campbell*, at p. 508, fn. omitted.) Similarly, here, it is reasonable to conclude that the Legislature never intended that the term "remarriage," within the meaning of section 4337, would encompass a commitment ceremony where the couple intentionally did not meet the legal requirements of marriage.

■ Andrew has provided no authority that the term "remarriage" as used in section 4337 means anything other than a remarriage carried out in conformity with the statutory requirements. Because Andrea and Todd did not meet those requirements, they did not marry, and Andrew's obligation to pay spousal support did not terminate under section 4337.

## C. *Estoppel*

Andrew next argues that even if the commitment ceremony between Andrea and Todd did not constitute a remarriage under section 4337, Andrea should be estopped to deny that she remarried. Andrew points to Evidence Code section 623, which provides: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."

The doctrine of estoppel has been applied in the family law context. (See *In re Marriage of Valle* (1975) 53 Cal.App.3d 837 [126 Cal.Rptr. 38] [applying estoppel doctrine to prevent a man from denying that he was the father of his brother's children].) However, as Andrew concedes, the estoppel

---

[6] In *In re Marriage of Seaton* (2011) 200 Cal.App.4th 800 [133 Cal.Rptr.3d 50] (*Seaton*), which was published during the pendency of this appeal, the Court of Appeal determined that under Nevada law, as under California law, a bigamous marriage is " 'void without any decree of divorce or annulment or other legal proceedings' . . . . [Citation.]" (*Id.* at p. 807.) We agree with Andrea's counsel's statement at oral argument that *Seaton* does not provide significant guidance on any of the issues presented in this appeal.

doctrine has not been applied in California to prevent a person from denying the validity of a marriage.[7] Nevertheless, Andrew argues that Andrea, who voluntarily participated in a marriage ceremony, should be held to have relinquished her right to further support.

■ In order for estoppel to apply, the complaining party must show: "(1) [t]he party to be estopped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the other party to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage he has thus inflicted upon the second party." (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 488 [81 Cal.Rptr.3d 72].) Andrew makes no effort to show that the elements of estoppel have been met in this case. Instead, he attempts to cast it as a case of "quasi-estoppel." Under the concept of quasi-estoppel, Andrew argues, a showing of actual reliance and disadvantage need not be shown.

In support of his argument that the concept of quasi-estoppel should be considered, Andrew cites only one California case, *Campbell.* Andrew argues that the *Campbell* court described *Sefton* and *Berkely* as applying a quasi-estoppel doctrine when those courts concluded that the ex-husband was entitled to rely upon the apparent remarriage of his former spouse. (*Campbell, supra,* 136 Cal.App.4th at p. 509.) In those cases, Andrew argues, actual reliance was not a requirement.

While the *Campbell* court did note that the *Sefton* and *Berkely* courts "applied what is essentially an estoppel analysis" (*Campbell, supra,* 136 Cal.App.4th at p. 509), we find that the *Campbell* court did not intend to create a new concept of "quasi-estoppel" as to marriage. We decline to apply this concept under the circumstances before us.[8]

## II.  *Length of marriage*

Andrew also argues that the trial court abused its discretion by giving little or no weight to the short length of the parties' marriage. Andrew points out that the parties were married for only about four and one-half years at the

---

[7] We decline to discuss the foreign authorities cited by Andrew, as he has failed to convince us that they should be considered persuasive authority under California law.

[8] California courts have accepted a concept of quasi-estoppel, or judicial estoppel, in limited circumstances. (*People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, 188–189 [125 Cal.Rptr.2d 365].) The party invoking judicial estoppel must show that the party against whom the estoppel is asserted took an inconsistent position in a prior judicial or administrative proceeding, and that the position was adopted in the first tribunal in some manner. (*Id.* at p. 189.) Andrew makes no effort to show that these elements have been met.

time of their divorce. By the time of the trial and the December 16, 2010 order, Andrew had been under an obligation to pay Andrea spousal support for more than half the length of their marriage. Andrew points out that the trial court specifically noted that the Family Code provides a guideline which establishes that spousal support should be paid for half the length of the marriage.

■ The trial court correctly noted that: "The code provides a guideline, not a hard and fast rule that support should be paid for half the length of the marriage."

This guideline is found in section 4320, which provides numerous factors for the trial court to consider when determining the amount and duration of spousal support. Among the factors that the court must consider is the duration of the marriage. (§ 4320, subd. (f).) The section further provides that the trial court shall consider: "The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties." (§ 4320, subd. (*l*).)[9]

■ The parties agree that the trial court's decision regarding the amount and duration of spousal support is subject to the abuse of discretion standard. (*Kerr, supra,* 77 Cal.App.4th at p. 93 ["In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it."].) "In awarding spousal support, the court must consider the mandatory guidelines of section 4320." (*Kerr,* at p. 93, fn. omitted.) However, once it does so, "the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion." (*Ibid.*) Appellate courts must act with "cautious judicial restraint" in reviewing spousal support orders. (*In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 50 [272 Cal.Rptr. 560].)

The record reveals that the trial court took into consideration the length of the parties' marriage when it made the modified spousal support order. As Andrew points out, the court specifically noted that the Family Code sets a guideline for spousal support of a period of one-half the length of the

---

[9] Section 4336 provides that a marriage of 10 years or more is a marriage of long duration.

marriage. The court also considered Andrea's cohabitation with Todd. Despite its consideration of these two factors, the court exercised its discretion to continue the spousal support, at a reduced rate. In doing so, the court considered other factors, as well as the circumstances of the parties, as permitted under section 4320. Specifically, the court found that there was no competent evidence that Andrea could be self-supporting, and that Andrew had been slow to pay Andrea the amounts of community property that he agreed he owed her but still had under his control. Simply put, the court felt that Andrew could not "withhold money that rightfully belongs to [Andrea] and then argue his support should terminate." Andrew presents no authority that the court's consideration of the failure to turn over community property is impermissible.[10] We find no abuse of discretion in the court's decision to continue spousal support.

## III.  *Start date for modifications*

Andrew filed his OSC regarding termination of spousal support on October 19, 2009. Andrew's OSC raised various grounds for termination or reduction of spousal support. Those grounds included Andrea's alleged remarriage; the length of the marriage versus the length of time Andrew had been paying spousal support; Andrea's failure to make efforts to become self-supporting; and Andrea's cohabitation with Todd.

On September 14, 2010, the trial court filed its ruling on submitted matter, reducing the amount of spousal support from $32,547 per month to $20,000 per month. However, the court made the reduced order effective as of May

---

[10] Andrew argues that section 2550 provides that the community estate of a couple is normally divided at the time of the judgment of dissolution or at a later time if jurisdiction to do so is reserved. Here, Andrew argues, because the court reserved jurisdiction to divide the parties' property at a later time, Andrew was not required to distribute any part of the community property estate to Andrea until division of the entire estate. Without citation to legal authority, Andrew claims that "the fact that Andrew did not distribute the entire amount before trial cannot have been a ground for the trial court's refusal to terminate support." We decline to accept Andrew's argument that the trial court "cannot" consider the failure to distribute community property which all parties have agreed belongs to the other spouse. Nothing precludes the trial court from considering any relevant circumstance, and the trial court "knows much more about the parties and what constitutes an appropriate duration for spousal support than will ever be known by a later judge." (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 664 [235 Cal.Rptr. 587].) Further, as Andrea points out, in *In re Marriage of Stallcup* (1979) 97 Cal.App.3d 294 [158 Cal.Rptr. 679], the Court of Appeal affirmed a trial court decision ordering that spousal support would continue until the wife received her share of the community property. The *Stallcup* court concluded: "Given husband's history of disobedience to court orders, it was entirely reasonable and within its discretion for the trial court to provide for support until wife receives all her share of the community property." (*Id.* at p. 302.) While the circumstances in *Stallcup* were not identical to those in this matter, the case is at odds with Andrew's position that this factor cannot be considered by the court.

15, 2010, instead of October 19, 2009. The court noted that Andrew did not file an income and expense declaration (form FL-150) until May 9, 2010. Based on the filing date of Andrew's form FL-150, the court stated that it could "only go back in time to May 15, 2010 in modifying support. The respondent cannot fail to comply with the court's filing requirements and gain the time advantage of a retroactive modification date."

Andrew argues that the court's failure to make its modification retroactive to October 19, 2009, resulted in a "windfall" to Andrea for the seven-month period of October 19, 2009, to May 15, 2010. Andrew argues that since the trial court reduced the support to $20,000 per month, Andrea's windfall amounted to $87,829 ($32,547 - $20,000 x 7).

Andrew argues that the court's focus on the date of Andrew's updated income and expense declaration was error. First, Andrew argues, no statute or rule required Andrew to file an income and expense declaration with his OSC application. Second, where, as here, the financial condition of the moving party is not pertinent to a determination of the relief requested, the moving party's failure to provide an income and expense declaration does not prevent the trial court from granting the relief.

The parties agree that it is within the trial court's discretion to make an order retroactive. Section 4333 states that "[a]n order for spousal support in a proceeding for dissolution of marriage or for legal separation of the parties may be made retroactive to the date of filing the notice of motion or order to show cause, or to any subsequent date." An order making a modification retroactive to a certain date is reviewed for abuse of discretion. (*In re Marriage of Jacobs* (1981) 126 Cal.App.3d 832, 834 [179 Cal.Rptr. 169].)

The rule of court governing income and expense declarations provides that such a declaration must be filed where it is relevant to the relief requested. California Rules of Court, rule 5.128(a) provides: "A current *Income and Expense Declaration* (form FL-150) . . . when such form is appropriate . . . must be served and filed by any party appearing at any hearing at which the court is to determine an issue as to which such declarations would be relevant. 'Current' is defined as being completed within the past three months providing no facts have changed."

█ As Andrew points out, this rule only requires the filing of an income and expense declaration when it is "appropriate" and "relevant." Andrew argues that the grounds he asserted for termination and reduction had nothing to do with his financial condition, therefore he was not required to file an income and expense declaration at the time he filed his OSC in October 2009.

The trial court clearly felt that an income and expense report was relevant to Andrew's OSC. At the December 1, 2009 hearing, the court noted that it

needed an updated income and expense report "under California Rule[s] of Court[, rule] 5.128" before considering Andrew's OSC. Under section 4320, ability to pay, and the needs of the parties, are factors that the court must consider in determining the amount and duration of an order for spousal support.[11] In addition, the court noted in its initial ruling that it was concerned about Andrew's failure to consistently pay the amount of support that he owed, and that Andrew should have already turned over money that both parties agreed rightfully belonged to Andrea. Under the circumstances, we find no error in the trial court's determination that an income and expense report was relevant, and therefore required, under the California Rules of Court.[12]

## IV. *Reservation of jurisdiction to retroactively modify child support*

■ In its September 14, 2010 ruling on submitted matter, the trial court included language indicating that it was reserving jurisdiction over the start date of the modification of its child support order. A reservation of jurisdiction to retroactively change a support order is impermissible under *In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 593–594 [124 Cal.Rptr.2d 342]. (See *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 639–642 [120 Cal.Rptr.3d 184].) However, in its final order dated December 16, 2010, the court did not include such language.

Andrea argues that the court's comments in its September 2010 ruling on submitted matter are of no legal consequence, as that ruling was superseded by the final order. (See *In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646 [253 Cal.Rptr. 770] [" '[A] court is not bound by its statement of intended decision and may enter a wholly different judgment than that

---

[11] Andrew argues that section 4320 only governs permanent spousal support orders, not pendente lite spousal support. Andrew argues that the statute governing pendente lite spousal support, section 3600, only mentions two of the factors listed in section 4320: domestic violence and spousal abuse. First, we note that Andrew has relied on the principles codified in section 4320 in arguing that Andrea's spousal support should be terminated because he has paid it for longer than half the marriage. (§ 4320, subd. (f).) Andrew cannot rely on this statute when it serves him but deny its applicability when it does not. Further, nothing in section 3600 prevents a trial court from considering the factors listed in section 4320, including ability to pay—especially where, as here, the payor has been inconsistent.

[12] Andrew also argues that, because he had a right against self-incrimination in the contempt proceedings, the trial court made it clear that Andrew would not have to respond to any financial requests pending the outcome of the contempt proceedings. The court's precise words were: "[Andrew] is not required to respond to any financial issue OSC until after the resolution of the contempt, okay, that way you can file whatever you want and she will have her protection, [Andrew] will have his protection." The court's language was limited to Andrew's *response* to a "financial issue OSC." It did not relieve Andrew of the obligation to file an updated income and expense report in connection with his own OSC, which he had previously been directed to do.

announced.' "].) Andrew concedes that if this court agrees with Andrea, then he has nothing to challenge.

Because the language in the September 2010 ruling on submitted matter was not included in the final order of the court, Andrew's appeal of this issue is unnecessary.

## DISPOSITION

The order is affirmed. Each side to bear its own costs on appeal.

Boren, P. J., and Doi Todd, J., concurred.

A petition for a rehearing was denied September 11, 2012, and appellant's petition for review by the Supreme Court was denied November 14, 2012, S205745.