Filed 3/20/26  Edgcomb v. Powers CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| JOHN EDGCOMB,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>APRIL POWERS,<br><br>    Defendant and Respondent. | A171951<br><br><br>(Marin County<br>Super. Ct. No. FL1600953) |

In 2018, after 21 years of marriage, John Edgcomb and April Powers negotiated a marital settlement agreement requiring John to pay $15,000 per month in spousal support to April, plus capped bonus support.[1]  After his income declined in 2023, John filed a request to terminate the spousal support under Family Code section 4322, or in the alternative to modify the amount of spousal support under Family Code section 4320.[2]  April agreed that John's diminished income warranted reducing her level of support to $10,350 per month, but she otherwise opposed John's request.

---

[1] As is customary in family law cases, we use the parties' first names for clarity, not out of disrespect.  (*In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 832, fn. 1.)

[2] Subsequent undesignated statutory references are to the Family Code.

The trial court found that John's drop in income constituted a material change of circumstances, but it further determined that April's separate estate was not sufficient to meet her needs. Accordingly, the court denied John's request to terminate spousal support, and it granted his request to modify the spousal support, lowering it to $10,000 per month. John appealed both rulings. We affirm.

## I. BACKGROUND

John and April married in October 1993. They had one daughter, who reached majority in April 2018. John and April enjoyed a high marital standard of living. John was the primary earner, working as the partner of a law firm and generally earning seven figures in annual income. April was the primary caretaker for their daughter, and she worked part-time as a physical education instructor. In 2014, the last year she worked, April earned less than $30,000.

John and April separated in May 2015 and subsequently negotiated a marital settlement agreement. Judgment was entered incorporating the agreement on March 15, 2018. Each party received $3.2 million in community property; April's share included the family residence. The judgment recognized John's "base income" as $579,000, and it imputed $70,000 in income to April. The judgment required John to pay $15,000 per month in spousal support to April, plus bonus support in the event John's annual income exceeded $579,000 up to a cap of $900,000.[3]

---

[3] The spousal support payments were taxable to April and deductible to John. The percentage of John's income payable as bonus support gradually decreased, starting at 25 percent from 2018 through 2020, dropping to 22 percent from 2021 through 2024, and dropping again to 10 percent in 2025 and beyond.

After the parties divorced, April sold the family residence and purchased a home with a mortgage. John purchased a home with all cash.

In 2023, John's annual income was $385,000, a decrease of roughly a third from his $579,000 base income as determined by the judgment. In October of that year, he filed a Request for Order to Change Spousal Support (RFO), seeking "termination of the order for spousal support issued on March 15, 2018 or in the alternative, a substantial reduction in the amount of spousal support." He asserted two grounds for the requested relief: his decreased income and April's ability to support herself at the marital standard of living due to the growth in the net worth of her assets.

April agreed there was "one changed circumstance . . . John's ability to pay spousal support." But she disputed that the value growth in her asset portfolio constituted changed circumstances. She represented that her expenses were about $15,000, excluding her healthcare costs, and therefore she required $21,000 per month in gross income.[4] She calculated that "[u]sing a 3% return on her invested assets, she could generate investment income of approximately $5,250 per month." If she also began taking $1,298 per month from a pension, bringing her gross income to "approximately $6500," then she would "still need[] $14,500 per month to meet her needs unless she [began] drawing down savings and principal." Thus, she argued that John was entitled to a reduction—but not a termination—of spousal support, and she consented to decreasing her spousal support to $10,350 per month, nearly one-third less than the amount set by the judgment.

---

[4] April's memorandum of points and authorities in opposition to John's RFO stated that her expenses were "$15,085 per month not including Medicare and gap policy." In her attached declaration, April stated that her "monthly expenses [were] $14,894, not including $820 per month for Medicare plus and a supplemental Blue Shield plan."

In reply, John countered that April's request for a mere reduction in spousal support was inappropriate. He contended, inter alia, that her "demand [was] premised on the false notion that: 1) she should not have to expend any principle (savings) to pay for the cost of the . . . lifestyle she has enjoyed since the separation . . .; 2) she need not take full advantage of prevailing money market interest rates above 5% . . . because she is risk averse . . . ." Along with his reply briefing, John filed the declaration of his expert, Natalie McFarlin, who calculated April's post tax assets and pretax retirement assets available through 2042 (the end of April's actuarial life expectancy at age 84).

The trial court held a hearing on John's RFO at which it heard John and April's testimony, and then the matter was continued. Neither party requested an evidentiary hearing. But April submitted a memorandum of points and authorities in rebuttal to McFarlin's declaration, and McFarlin submitted an updated declaration. McFarlin's updated declaration assumed April's $14,894 asserted monthly expenses would increase at the same rate as inflation over the past 20 years. McFarlin found that April's post tax assets were $2,430,719 and her pretax retirement assets were $839,411, and McFarlin assumed a 5% rate of return on those investments. McFarlin also anticipated that April would receive "social security starting at her retirement age, 50% of [John's] social security at his full retirement age (replacing the amount she previously received under her own benefit), [her] pension payment . . . and age-based mandatory withdrawals from retirement accounts." Based on those findings and assumptions, McFarlin calculated that April's cashflow would be negative, starting at a roughly $80,000 deficit in the near term but growing to roughly a $190,344 deficit in the year 2042. By withdrawing principal from her assets to make up for her insufficient

4

income, McFarlin determined that April would have post tax assets of $147,756 and retirement assets of $1,147,233 at age 84. McFarlin separately projected that the value of April's home would increase at the same rate as other homes in her zip code had increased over the past 20 years (11.22%), resulting in $4,906,488 of home equity at age 84.

At the continued hearing, John requested a statement of decision, and the court heard counsels' arguments. The court duly issued a proposed statement of decision, to which John filed objections.

In its final statement of decision, the trial court found that John's reduction in income constituted a material change in circumstances, authorizing the court to consider John's RFO. Specifically, the court accepted that John's annual income had dropped from $579,000 at the time of judgment to $385,000 at the time of trial. Based on McFarlin's findings, as well as April's evidence and testimony, the court found April's post-tax assets totaled $2,430,719 and her pretax retirement accounts totaled $839,411. Finding that April "could generate more income from her estate" than she was, the court also adopted McFarlin's determination that a reasonable rate of return on April's assets was 5%. The court found April's calculation of her expenses—$15,714[5] per month—to be credible. Thus, in line with McFarlin's calculations, the court found that "[e]ven if [April's] assets were all reasonably managed, and [April] is able to earn a 5% return on her assets . . ., and assuming [April] eventually does receive the amounts attributed to her by [John] from [April's] pension and social security, [April] still has a deficiency which would require [April] to invade capital and draw down principal in order to meet her expenses."

_____

[5] This amount is the aggregate of "$14,894, plus $820 for health insurance."

5

The trial court held that it "need not look beyond the actual income produced from a supported spouse's assets in cases where those assets are reasonably managed." It expounded that April "may be required to invade principal and draw down on capital, but only to the extent that those assets would create income if reasonably managed." The court declined to speculate that April's home equity would appreciate over the next 19 years at the historical rate of the past 20 year period, stating it was premature to do so and that April was "entitled to remain in her home." Thus, "[a]fter computation of [the 5%] imputed rate of return, and even if [April's] expected pension and social security income are attributed to [April]" the court found that April's separate estate was not sufficient for her proper support and therefore denied John's request to terminate spousal support.

Having determined that April still required spousal support to maintain the marital standard of living, the trial court then applied the enumerated factors in section 4320 to determine if the spousal support award should be reduced. In view of those factors, the court modified the spousal support to $10,000 per month, taxable to April and deductible to John, and eliminated the bonus spousal support.

John appealed.

## II.   DISCUSSION

### A.   Legal Standards

We generally review orders to modify spousal support for abuse of discretion. (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1145.) "In reviewing findings supporting a trial court's exercise of discretion in modifying spousal support, ' . . . this court must accept as true all evidence tending to establish the correctness of the trial judge's findings, resolving all conflicts in the evidence in favor of the prevailing party and indulging in all

6

legitimate and reasonable inferences to uphold the judgment.' " (*In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 82, fn. 5 (*Stephenson*).) A trial court's failure to base findings on substantial evidence constitutes an abuse of discretion. (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47.) "However, where the appeal raises a question regarding the proper interpretation of a statute, or the proper application of the law to uncontested facts, the standard of review is de novo." (*Left*, at p. 1145.)

Before a trial court may consider modifying a prior spousal support order, it "must first find ' " 'a material change of circumstances since the last order.' " ' " (*In re Marriage of T.C. & D.C.* (2018) 30 Cal.App.5th 419, 424 (*T.C.*).) When a marital settlement agreement governs spousal support, "the trial court's changed-circumstances determination must ' " 'give effect to the intent and reasonable expectations of the parties as expressed in the agreement.' " ' " (*Ibid.*) "The moving party bears the burden of establishing a material change of circumstances . . . ." (*Stephenson, supra,* 39 Cal.App.4th at p. 77.)

Where there is a material change in circumstances in view of the parties' reasonable expectations, the trial court has broad discretion to decide whether to modify a spousal support order. (*In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 928 (*Terry*).) In exercising this discretion, the court must consider and apply the factors set out in section 4320.[6] (*Ibid.*; see *In re*

---

[6] These criteria include: (1) "[t]he extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage"; (2) "[t]he extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party"; (3) "[t]he ability of the supporting party to pay spousal support"; (4) "[t]he needs of each party based on the standard of living established during the marriage"; (5) "[t]he obligations and assets, including the separate property, of each party"; (6) "[t]he duration of the

7

*Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1273.) While each factor must be applied, the court has discretion to determine the appropriate weight to accord to each. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304, superseded by statute on other grounds as stated in *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1049.) Independent of the section 4320 factors, however, section 4322 *mandates* that the trial court terminate spousal support in a modification proceeding "where there are no children" if the supported spouse has "acquire[d] a separate estate, including income from employment, sufficient for the party's proper support." (See *Terry, supra,* 80 Cal.App.4th at p. 928.)

**B.   The Trial Court Did Not Err in Denying John's Request to Terminate Spousal Support Under Section 4322**

At the threshold, John contends that the trial court was authorized to consider whether to terminate support under section 4322 (in addition to conducting its section 4320 analysis) because the court found there was a material change of circumstances concerning his ability to pay. April disagrees, arguing that changes of circumstance material to section 4322 analysis are the supported spouse's acquisition of a separate estate, the growth of the supported party's existing separate estate, or a material decrease in the supported party's needs. Because the court did not find, and John did not present evidence showing that her assets had materially

marriage"; (7) "[t]he ability of the supported party to engage in gainful employment"; (8) "[t]he age and health of the parties"; (9) "[a]ll documented evidence of any history of domestic violence . . . between the parties or perpetrated by either party against either party's child"; (10) "[t]he immediate and specific tax consequences to each party"; (11) "[t]he balance of the hardships to each party"; (12) "[t]he goal that the supported party shall be self-supporting within a reasonable period of time"; (13) "[t]he criminal conviction of an abusive spouse"; and (14) "[a]ny other factors the court determines are just and equitable." (§ 4320, subds. (a)–(n).)

8

changed in a way not anticipated by the parties' marital settlement agreement, April asserts the court's section 4322 decision must be affirmed.

We are skeptical of John's position. The purpose of the changed circumstance prerequisite under section 4322 is to bar collateral attacks on a prior final order and provide legal protection to marital settlement agreements, thereby providing litigants with greater certainty. (*In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1479; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480.) Establishing a material change of circumstance on one ground and then attacking the final order on another, circumvents that purpose. But we need not resolve this legal question because John's argument fails on the merits. (Cf. *In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 956 ["Although the trial court may not modify spousal support without proof of a change in circumstances, the converse is not true"].)

John argues that the trial court erred in assessing April's separate estate by failing to consider April's "present and future" social security income and pension income, April's "investment and retirement account balances," income from April's retirement account, or April's home equity. He further urges this court to conduct a de novo review of the trial court's evaluation of April's "separate estate." While the statutory definition of "separate estate" is a legal question we review de novo,[7] the record refutes

---

[7] Under the instant circumstances, we agree with John (and April does not dispute) that April's "separate estate" pursuant to section 4322 must include all of her assets and income. (See *Terry, supra,* 80 Cal.App.4th at p. 930; but cf. *In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1934 [community property transferred to wife during pendency of divorce to offset community funds spent by husband was not part of wife's "separate estate" for purposes of section 4322 and continued to be characterized as community property until the final property division].)

John's contention that the court did not consider all of April's assets and income.

The trial court expressly restated McFarlin's determination that April had $2,430,719 in post-tax assets and $839,411 in a pretax retirement account, and it found those figures were "confirmed" by April. The court agreed with McFarlin that April "could reasonably earn a 5% return on her investments and cash assets, or $121,536 in 2024." The court also walked through McFarlin's calculations and projections of April's income, including "the monthly social security payments . . . which Ms. McFarlin anticipates [April] will receive" as well as "the monthly . . . pension payments which McFarlin anticipates [April] will receive in the future . . . ." The court acknowledged the parties' agreement that $70,000 in income would be imputed to April. And the court further noted McFarlin's "predictions" regarding April's home equity. Thus, contrary to John's contention, the trial court assessed April's "separate estate" under section 4322 by taking stock of all of April's assets and potential income streams.

Nonetheless, as evidence the trial court did not consider all of April's assets, John points to the court's statement that it was "premature" to consider April's pension and social security payments. But rather than reveal that the court did not consider those expected payments as part of April's separate estate, the passage referenced illustrates that the court found those future payments were insufficient to provide "proper support" at present. (See *In re Marriage of Swain*, *supra*, 21 Cal.App.5th at p. 836 ["a modification order must be 'based on current facts and circumstances' "].) Moreover, the court went on to state that "even assuming [April] eventually does receive the amount attributed to her by [John] from [her pension] and social security, [April] would still have a [cash flow] deficiency . . . ."

10

The trial court's discussion of April's other assets shows that it properly took account of April's separate estate, but it did not share John's view that they were sufficient or appropriate to meet April's needs. For example, after acknowledging April had equity in her home, the court declined to require her to invade her home equity to meet her needs. Also, the court's calculation that April's investments and cash would yield $121,536 in 2024 was based solely on April's post-tax assets. But this does not mean it did not consider April's pre-tax retirement account in assessing April's separate estate. Echoing McFarlin's declaration, the court found that April would suffer a $190,344 shortfall in income in 2042. McFarlin reached that conclusion *despite* assuming April would start making mandatory withdrawals from her pre-tax retirement account in 2030. Thus, it is reasonable to infer the court considered the pre-tax account in assessing April's estate in totality but adopted McFarlin's assumptions and projections. (*Stephenson*, *supra*, 39 Cal.App.4th at p. 82, fn. 5.)

It appears that John's fundamental objection is to the trial court's refusal to find that April's separate estate could provide for her proper support by "draw[ing] down on her investment and retirement principal as needed to cover any budget deficits." He contends that this court's divided opinion in *Terry*, *supra*, 80 Cal.App.4th 921 illustrates that the trial court did not properly assess all of April's assets or consider how those assets were sufficient for April's proper support. We disagree, and we conclude that the court correctly understood and properly applied section 4322. (*Terry*, at p. 929 [while the trial court's finding of the amount that constitutes proper support is a question of fact, the determination whether a separate estate is sufficient to provide proper support is reviewed de novo].)

11

In *Terry*, the issue was whether the wife's separate estate—in view of its appreciation over time—was reasonably capable of generating income necessary for the wife's proper support. (*Terry*, *supra*, 80 Cal.App.4th at p. 928.) To answer that question, the majority first clarified that "the section 4322 concept of a 'separate estate' is not limited to the income *actually and presently* produced by the estate." (*Id.* at pp. 929–930, italics added.) The majority explained that when evaluating the separate estate, courts need not "look beyond the *actual* income produced from a supported spouse's assets in cases *where those assets are reasonably managed*." (*Id.* at p. 930, italics added.) It expounded: "Again, the ultimate section 4322 determination is whether a particular estate is, or is not, reasonably capable of providing for a spouse's proper support. That determination will vary with the nature of the particular estate. Where, as here, the supporting spouse challenges the reasonableness of the supported spouse's investment strategy, the court should look to the estate as a whole, including the actual and reasonable income potential from investment assets, as well as their total value, in resolving the issue of the estate's sufficiency for proper support." (*Ibid.*)

Turning to the question before it, the majority discussed how the wife had pursued an investment strategy that grew her investment portfolio from about $2 million to over $3.5 million in just 40 months, "[y]et the estimated annual income from the . . . account was $95,130, for a lower yield of approximately 2.7 percent." (*Terry*, *supra*, 80 Cal.App.4th at p. 931.) In view of her other assets and income, the wife's overall yield was "approximately 2.8%." (*Ibid.*) The court further noted that the wife "could . . . draw on [her retirement] account without penalty." (*Ibid.*) Given that the upper end of the wife's expenses was "$144,000 per year, net of taxes," the majority rejected the trial court's determination that the wife's estate was not sufficient to

12

meet her needs because she could reasonably shift her investment strategy to generate more income or draw upon her retirement account. (*Id.* at pp. 931–932.) In other words, because the wife's assets, *if reasonably managed*, could reasonably produce *income* sufficient to support her proper needs, her estate met the "legal standard of sufficiency" and section 4322 applied. (*Id.* at p. 932.) The majority concluded "[i]t is time for [the wife] to either generate more income or otherwise resort to a negligible portion of her growing capital to meet her needs." (*Ibid.*)

Contrary to John's assertion, the majority opinion in *Terry* did not "[e]xpress[] frustration with the trial court's refusal to consider all the assets available to [the wife]." Rather, it rebuked the trial court for "persist[ing] in its reticence to do anything that might prompt [the wife] to change her investment strategy, draw down on the retirement account or liquidate or leverage any of her substantial assets." (*Terry*, *supra*, 80 Cal.App.4th at p. 932.) The majority spelled out that "[t]he trial court's job is to ascertain whether the estate reasonably *could generate sufficient income* for proper support," and, having done so, it was up to the spouse to make her own financial decisions. (*Ibid.*, italics added.) John is therefore mistaken in asserting that there is an inconsistency in the majority's conclusion that "the separate estate is not synonymous with income" and its statement that courts need not "look beyond the actual income produced from the supported spouse's assets in cases where those assets are reasonably managed." (*Id.* at p. 930.)

*Terry* does not stand for the proposition that a supported spouse is required to invade the principal of his or her assets before he or she may qualify for support. Nor does it stand for the proposition that a separate estate is sufficient, as a matter of law, to generate proper support if the value

13

of the estate's assets divided by the supported spouse's expected number of remaining years renders enough capital to meet that spouse's annual expenses within the expected life span of the supported spouse. Nor does Justice Sepulveda's dissent assert that the majority's opinion stands for either proposition. Instead, she described the majority opinion as creating a two-step approach: first, a trial court must aggregate the value of a supported spouse's assets;[8] second, the court must "look to the 'totality of the facts' to determine whether the estate is sufficient to provide for his or her proper support."[9] (*Terry, supra,* 80 Cal.App.4th at pp. 942–943 (dis. opn. of Sepulveda, J.).)

The instant order demonstrates that the trial court properly understood *Terry*. The court found that April's estate as a whole, including her actual and reasonable income potential, could generate more income from her investments if they were reallocated. But even based on a reasonable 5% rate of return on her investments, and expected pension and social security income, the court found April's separate estate still did not generate sufficient income to provide proper support. The court acknowledged that a

---

[8] Regarding this first step in a section 4322 inquiry, Justice Sepulveda was critical of the majority's holding that "assets acquired through the final division of community property should be considered in assessing the sufficiency of the estate for proper support." (*Terry, supra,* 80 Cal.App.4th at p. 931 (maj. opn.); *id.* at p. 942 (dis. opn. of Sepulveda, J.).) The majority's approach to aggregating separate and community property is not at issue here. (See *ante,* fn. 7.)

[9] Justice Sepulveda was also critical of the second step, asserting that "California courts *do look only to actual income* produced from the supported spouse's assets," as opposed to potential income from the reallocation of " 'nonincome producing property.' " (*Terry, supra,* 80 Cal.App.4th at p. 944 (dis. opn. of Sepulveda, J.).) She further asserted that "the majority stop[ped] short of announcing a clear rule as to how the trial court should analyze the 'totality of the facts' before it." (*Id.* at p. 945.)

"[supported spouse] may be required to invade principal and draw down on capital, but only to the extent that those assets would create income if reasonably managed." Again, John is mistaken that the court contradicted itself by also articulating the corollary rule—i.e., "once the court determines . . . that [supported spouse's] investments are reasonably managed and producing a reasonable income, then the court need not require a supported spouse to invade capital and principal."

We find no error in the trial court's factual findings about April's proper needs, her assets and income, or the realistic rate of return if her assets were reasonably managed. Substantial evidence—notably, the calculations and projections of John's expert, McFarlin—supports those findings. Because the court found there is a yawning gap between April's income—assuming April reasonably manages her assets and assuming she collects the pension and social security payments anticipated by McFarlin— and April's expenses, we conclude her separate estate is not legally sufficient to provide for her proper needs. Accordingly, section 4322 does not apply.

## C. The Trial Court Did Not Erroneously Omit Income in Its Section 4320 Analysis

John argues the trial court improperly omitted $56,803 of April's 2024 income—$14,832 in social security income and $41,971 in income from her pre-tax retirement account—from its section 4320 analysis and "offer[ed] no reason" for doing so. John is incorrect, and he misreads his own expert's calculations concerning April's preretirement account's returns.

April was not receiving income from social security payments at the time of the hearing. John argued that "April [would be] entitled to start drawing a monthly benefit of $1,236 at age 66."[10] However, McFarlin

---

[10] John's assertion that the trial court omitted $14,832 of April's income in 2024 is based on this monthly amount.

asserted that April would be entitled to $1,293 in monthly social security payments when she reached "full retirement age on September 8, 2024," which sums up to $5,172 for all of 2024.

As the trial court explained, "[a] modification order must be based on current facts and circumstances." (See *In re Marriage of Swain, supra*, 21 Cal.App.5th at p. 836.) The order was "made without prejudice to [John's] right to request modification in the future." In any event, the court found that the "anticipated amounts" of April's social security income based on McFarlin's computations from 2024 to 2042 were insufficient to close the gap and meet April's proper needs. There was substantial evidence in support of this finding. And considering April would still have suffered a large shortfall in 2024 even if she began drawing benefits in January of that year,[11] we perceive no abuse of discretion by the court in adopting McFarlin's assumption and permitting April to wait to reach full retirement age before drawing benefits.

The trial court did not omit income from April's pre-tax retirement account either. John is confused. McFarlin did *not* calculate that "April would earn $41,971 of *income* on her retirement account in 2024." (Italics added.) Nor did McFarlin include the returns on April's pre-tax retirement account as a component of April's income. Instead, McFarlin included the mandatory withdrawal amounts starting in 2030 as a component of April's income. John appears to conflate an investment's rate of return (i.e., capital growth) and its yield (i.e., income), suggesting a mathematical impossibility that April could withdraw 5% from the account every year (not to mention

---

[11] While John asserts April could have narrowed her $80,197 shortfall by drawing $14,832 in social security benefits, McFarlin's computation included $5,172 of social security benefits. Thus, taking these numbers at face value, April would still be over $70,000 shy of her needs.

additional mandatory withdrawals) and still have the account grow due to a 5% annual rate of return.

Using an assumed 5% return on capital, McFarlin calculated that the account's value would grow by $285,480 in the 6 years from 2024 through 2029 (i.e., from $839,411 to $1,124,891). Assuming the same return on capital but also assuming April would begin making mandatory withdrawals in 2030, McFarlin calculated the account's value would grow by only $62,347 over the next 7 years from 2029 to 2036 (i.e., from $1,124,891 to $1,187,238) before slowly falling by $40,005 over the next 6 years. None of McFarlin's arithmetic works if April also withdrew 5% from the account starting in 2024. John fails to show that the trial court erred in its section 4320 analysis.

### III.   DISPOSITION

The order is affirmed. April is entitled to her costs on appeal. (Cal. Rules of the Court, rule 8.278(a)(1).)

17

_____

Moorman, J.*

WE CONCUR:

_____

Brown, P. J.

_____

Streeter, J.

*Edgcomb v. Powers*/A171951

---

\* Judge of the Superior Court of California, County of Mendocino, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.