Filed 11/8/23  Marriage of Miller CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JASON MILLER and HEATHER MILLER. | B316552<br><br>(Los Angeles County Super. Ct. No. YD065760) |
| JASON MILLER,<br><br>        Respondent,<br><br>        v.<br><br>HEATHER BROOKS,<br><br>        Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gia Bosley, Judge.  Affirmed.

Law Offices of Gregory R. Ellis and Gregory R. Ellis for Appellant.

Klausner Johnson, Andrew R. Klausner; Kowal Law Group and Timothy M. Kowal for Respondent.

————————————————

Heather Brooks appeals from an order terminating spousal support. Brooks argues the trial court abused its discretion by finding she received sufficient notice of the expectation to become self-supporting, failing to consider relevant factors under Family Code section 4320,[1] and terminating support retroactively. Brooks also contends the court prejudicially erred by denying her request for a statement of decision. We find no error and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*The Marriage*

Jason Miller and Brooks married in 2003 in Iowa. Brooks worked as a Sales Manager at JCPenney and Miller worked for a financial group. Brooks left her position with JCPenney in 2011 after Miller received a promotion that required the couple to relocate to Los Angeles. In Los Angeles, Brooks was unemployed for nine months before starting full-time employment at the Duty Free store at Los Angeles International Airport (LAX). Brooks's annual salary was $70,000. Miller claimed that Brooks could earn as much as $100,000 with bonuses.

Within two months, Brooks left her position at LAX. While Brooks indicated she left because both she and Miller found the time commitment was detrimental to their marriage, Miller asserted she unilaterally decided to quit. With Miller's support, Brooks decided to pursue photography as a new career.[2] She began studying photography in 2011.

---

[1] All further statutory references are to the Family Code unless otherwise noted.

[2] Brooks asserted that during this time she traveled often with Miller on his business trips and contributed to his work by "giving impressive speeches in front of . . . high-ranking members

In 2013, Brooks and Miller were in a car accident. As discussed in greater detail below, the parties dispute the severity of the accident.

In January 2014, Brooks started her own photography business. Brooks alleged that in September 2014, Miller committed an act of domestic violence against her that exacerbated the injuries she sustained in the 2013 car accident. Miller denied engaging in any domestic violence and claimed Brooks falsified the allegations. According to Brooks, "the Court declined to prosecute" Miller because she "did not release [her] statement."

### Dissolution and Marital Settlement Agreement

Miller filed for divorce in October 2014, after an 11-year marriage to Brooks. In her response to Miller's petition for dissolution, Brooks requested spousal support. The matter proceeded as an uncontested dissolution and, in October 2016, the court entered a judgment of dissolution that incorporated the parties' marital settlement agreement (MSA). Both parties were represented by counsel during the negotiation of the MSA and each expressly stipulated that they understood the terms of the agreement.

Under the terms of the MSA, Miller agreed to pay Brooks $2,433 per month in spousal support from January 1, 2015 until June 30, 2017, including a lump sum of $50,853.91 to satisfy his spousal support obligation from January 2015 through October 2015. The monthly amount was based on Miller's income of $9,167 per month and Brooks's income of $720 per month.

---

of his company." Miller denied Brooks had any involvement in his career.

Brooks's income was based on a 20-hour workweek at the earning level stated on her income and expense declaration.

The MSA included a clause titled "*Gavron* Notice" that stated: "Notice is hereby given pursuant to *In Re Marriage of Gavron* (1988) 203 Cal.App.3rd 705 [(*Gavron*)]. . . that it is anticipated that Wife shall seek to be employed full-time at her own highest earning potential with a goal of becoming economically not dependent upon spousal support." The court retained jurisdiction over spousal support, but the MSA prohibited any upward modification of support. The parties also stipulated that beginning July 1, 2017, $50,000 in annual income would be imputed to Brooks "in the event that she is not employed full time earning a salary commensurate with her earnings during the marriage." Further, the parties agreed to exchange updated income and expense declarations on or before May 1, 2017, and stipulated that based on the imputed income as of July 1, 2017, Miller's monthly spousal support payment would be reduced to $874.

In July 2017, $50,000 in annual income was imputed to Brooks, per the provisions of the MSA. Brooks understood this occurred because she was not working full time, and she understood the *Gavron* notice to mean that her "goal was to not have to rely on the spousal support" provided by Miller.

The MSA did not mention either party's health.

***Miller's Request for Order Terminating Spousal Support and Evidentiary Hearing***

In August 2019, Miller filed a request for a court order terminating spousal support. In a supporting declaration, Miller asserted Brooks had made no attempt to become self-supporting,

4

in violation of the *Gavron* notice, despite being "in good health."[3] He claimed Brooks performs physical activities and is socially active, traveling to Europe and engaging in volunteer work. He attached Brooks's resume, and retail management vacancies in her geographic area, to show that although Brooks had the education and work experience necessary to earn as much as $100,000 annually, she had made no effort in the preceding four years to become self-supporting. He asked the court to impute to Brooks an annual income of $100,000 and terminate further spousal support.

Miller also declared that he moved to Illinois in February 2019 and was making approximately "$5,000 less" than when the court entered the MSA.[4] In an accompanying income and expense declaration, Miller stated he worked full time in sales and earned a gross salary of $8,333 per month and an average monthly commission of $18,852.40. He also represented that he incurred estimated average monthly expenses of $21,653.

Brooks opposed the request. In her responsive declaration, Brooks denied Miller's claim that she was in good health. She declared that she continues to suffer from injuries sustained

---

[3]     Miller retained a vocational examiner and an independent medical examiner to evaluate Brooks's ability to work. Brooks was evaluated but did not agree to release her treating physician's records as requested by the examiners. Neither party sought to introduce reports from the examiners at the hearing on Miller's request for order.

[4]     It appears from Miller's testimony during the hearing that his declaration referred to a decrease of $5,000 per month.

during the 2013 car accident.[5]  She indicated she has chronic pain, even after undergoing several surgical procedures and tests, and her physical health and injuries worsened over time.  She attested that because of her injuries, it was "challenging and painful" to hold and handle a camera, she has been unsuccessful in building her photography business "due to physical constraints and disabilities," and now "must pursue a new career path."  She denied frequently traveling abroad, noting she took only one trip to Europe to care for a family member.  She further asserted she volunteers only as she is "capable," and denied completing any physical activities as a volunteer.

Dr. David Cho, Brooks's treating physician, submitted a letter in October 2019, and a substantively identical declaration in January 2020.  He diagnosed Brooks with cervical radiculitis, cervical degenerative disc disease, peripheral neuropathy, chronic postoperative pain of extremity, cervicobrachial syndrome, and chronic severe headaches.  In his letter, Dr. Cho stated that Brooks's pain "made it difficult for her to hold or manipulate heavy objects," her pain "frequently interferes with her activities," and the loss of sensation "has made it difficult to perform activities she was able to do prior to her accident."  Dr. Cho stated that Brooks's symptoms persisted despite treatment, which included medications, interventional pain treatments, physical therapy, and surgery, and noted that "there is a high likelihood that she will continue to have some degree of pain for some period of time."  Dr. Cho opined in the letter that Brooks "would benefit from limited activities and no heavy lifting for the

---

[5]     Miller claimed in a subsequent responsive declaration that Brooks "continued to work sometimes 12-hour days with photography" following the accident.

immediate future." He also stated it was "difficult to determine when it would be appropriate for her to return to work."

The trial court held an evidentiary hearing over four days in July and September 2021, during which Miller, Brooks, and Dr. Cho testified. Miller testified that from 2017 to 2018, his income dropped by approximately $100,000. He stated 2021 was "one of [the] worst years of [his] career" in terms of salary, and that he was on track to make $320,000 annually. Consistent with his prior declaration, Miller testified that Brooks worked full time during the marriage, potentially earning around $100,000 in annual salary plus bonuses at the LAX Duty Free store.

Miller disputed the nature of the 2013 car accident and the severity of Brooks's injuries. He described the accident as a "fender bender" during stop-and-go traffic. Miller testified that although Brooks complained about a sore neck shortly after the accident, she continued to engage in "activities that she normally engaged in prior to the accident" in the following year. These included horseback riding, biking, hiking, mountain climbing, and ocean kayaking, many of which lasted several hours and were done with some frequency following the accident. He stated there was no "noticeable reduction in the physical activities" Brooks engaged in between the March 2013 accident and their separation in October 2014.

Dr. Cho testified as a percipient witness. He listed the same diagnoses of Brooks as stated in his letter and testified that Brooks's conditions were causing "difficulty in some of her strength" and decreased sensation, primarily on her right side. From 2014 to 2016, he conducted three or four interventional treatments, including cervical epidural steroid injections, trigger

7

point injections, and physical therapy, to treat Brooks's pain. Dr. Cho indicated Brooks's prognosis had been erratic, explaining "there is sometimes some improvement and sometimes . . . some worsening of the pain." He testified it was "difficult to say" whether Brooks's condition would improve or deteriorate by a certain time. However, her condition at the time of the hearing was "stabilized."

With respect to her past employment, Brooks testified she worked at JCPenney until moving to Los Angeles with Miller. She was unemployed for nine months before she started working at the Duty Free store at LAX, which was the last full-time position she had held. Brooks testified that between her position at the Duty Free store and her work as a contract photographer, she supported Miller's career by traveling with him and giving presentations during his business meetings and seminars.

Brooks further testified that the 2013 car accident caused immediate pain in her back, neck, shoulders, spine, and right arm. She started treatment within 72 hours of the accident. She suffered nerve damage to her back, neck, elbow, and hand, for which she received several treatments, including surgery. Brooks claimed only some of Miller's testimony about her recreational activities following the accident was true. She described her physical activities before the separation as "moderate." The injuries from the accident curtailed her physical activities in a "gradual process."

As to her efforts to find full-time employment since that time, Brooks testified she had "applied for multiple photography jobs to equal full-time employment" since January 2017. She had "searched for jobs," "contacted people for jobs," and "applied for jobs" in 2020. On direct examination in July 2021, Brooks

testified she had not interviewed for any full-time position since before the COVID-19 pandemic. Brooks could not identify any potential employers, or any companies she interviewed with, between January 2017 and March 2020.

Although Brooks testified her "chronic pain in [her] neck, back and shoulder," nerve damage in her right arm, and chronic migraines were keeping her from working, she did not apply for disability at any time. At the continued September 8, 2021 hearing, Brooks testified on cross examination that she had worked with a recruiter to interview for another photographer position with Amazon approximately three weeks earlier. However, she testified she could not perform camerawork full time and believed she did not get the job because of her injuries.

Brooks testified she ultimately decided to pursue a new career in psychology because her injuries prevented her from building her photography business. As of July 2021, she had made "inquiries" into psychology programs but had not enrolled in any. Brooks did not testify to any efforts to find full-time employment outside photography.

Brooks earned $8,000 in 2017, $6,000 in 2018, $5,000 in 2019, and $0 in 2020. Her sources of income at the time of the hearing were spousal support, COVID-19 pandemic unemployment support, and personal savings. Brooks stated she had $63,000 to $67,000 in the bank and she had the resources to pay the costs of litigation, including attorney fees. She also confirmed that she had $435,000 in a "mutual funds brokerage" available to her. She testified she used $187,380 from a savings account but could not account for the expenditures, although she believed she had used the funds to pay credit card debt and medical expenses. In May 2018, she settled a personal injury

lawsuit stemming from the 2013 car accident for $150,000. She received about $40,000 after attorney fees, which she used to pay credit card debt and medical bills. Brooks did not disclose the settlement to Miller because she did not consider it a "property interest" subject to disclosure under the terms of the MSA.

## The Trial Court's Ruling

On September 8, 2021, the trial court issued an oral decision. The court found Brooks's failure to make efforts to become self-supporting was a material change in circumstances warranting termination of spousal support.

The court analyzed the evidence relevant to the factors in section 4320. Regarding earning capacity, the trial court found that although Miller was "gainfully employed" and Brooks was "not earning," Brooks is highly educated and has marketable skills. The court further found that Brooks's periods of unemployment during the marriage did not warrant significant weight in the analysis because the parties had been separated for seven years. The court considered the extent to which Brooks "contributed to the attainment [of an] education, training," a career position, or license of Miller, but indicated it did not believe this was a "significant factor."

The court noted Brooks and Miller had a marriage of long duration and the parties enjoyed an "upper middle class" standard of living during the marriage. The court indicated it was taking into account the parties' obligations and assets, including separate property, and all information in evidence about Miller's financial situation to determine his ability to pay spousal support. The court also accounted for the age of the parties, both of whom were in their mid-forties; described Miller as "in good health;" and acknowledged that Brooks testified she

10

had "a chronic, ongoing condition." Because Miller was not convicted of a crime related to the alleged domestic violence incident in 2014, the court did not factor any allegations about the incident into the section 4320 analysis.

The court then considered the balance of hardships. It stated that although termination of spousal support would be detrimental to Brooks because she would no longer receive the financial support, continuing the support order would be a hardship to Miller because he would be required "to pay a significant portion of his income" in support, even when considering the support payments reduced his taxable income.

The trial court, in assessing other "just and equitable" factors under section 4320, subdivision (n), addressed the *Gavron* warning and Brooks's ability to work. The court found the *Gavron* warning unambiguously established that Brooks's goal was to become self-sufficient and the clause imputing to Brooks a $50,000 annual income in 2017 was a built-in penalty "if [Brooks] were to fail to make any efforts to become self-sufficient." Based on Brooks's level of education and representation by counsel during the negotiations that led to the MSA, the court discredited Brooks's claim that she did not understand the warning.

Regarding Brooks's ability to work, the court acknowledged Brooks was injured in the 2013 car accident, but it credited Miller's testimony about Brooks's ability to engage "in social, athletic-type activities following the accident." The trial court also noted Dr. Cho had not testified that Brooks could not work at all, stating: "I did see the original letter from Dr. Cho indicating that there may be some limitations in terms of lifting heavy objects, but the court didn't hear any evidence that that was required in any of [Brooks's] prior types of employment or

11

that she had sought any type of employment that would not require her to lift or to bend or to do any of the types of activities that would have been restricted given . . . the current state of her health."

The court concluded it was "clear from the testimony . . . that [Brooks] not only did not make any efforts but has no intention or had no intention of making any effort at all to be employed full-time." The court set spousal support at zero and ordered "that it be retroactive to the service of the request for order."

On October 7, 2021, Brooks requested a Statement of Decision under section 3654 on 31 issues related to the dispute.[6] The trial court denied Brooks's request for a statement of decision as untimely.

## DISCUSSION

On appeal, Brooks contends: 1) the trial court failed to provide sufficient warning before terminating spousal support; 2) the trial court abused its discretion by failing to consider the section 4320 factors; 3) the trial court erred by terminating its jurisdiction and applying the order retroactively; and 4) the trial court erroneously denied her request for a statement of decision as untimely. We find no error and affirm the order.

## I. Principles Governing Modification of Spousal Support and Standard of Review

"Modification of spousal support, even if the prior amount is established by agreement, requires a material change of circumstances since the last order. [Citations.] Change of

---

[6] Section 3654 provides: "At the request of either party, an order modifying, terminating, or setting aside a support order shall include a statement of decision."

12

circumstances means a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported spouse's needs. [Citations.] It includes all factors affecting need and the ability to pay. [Citation.]" (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 982 (*McCann*).) In ordering or modifying spousal support, "the trial court *must* consider and weigh all of the circumstances enumerated in [section 4320], to the extent they are relevant to the case before it." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302 (*Cheriton*); *In re Marriage of Diamond* (2021) 72 Cal.App.5th 595, 602 (*Diamond*).) "A trial court acts within its discretion in denying spousal support where the supported spouse has failed to diligently seek employment sufficient to become self-supporting." (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1238 (*Shaughnessy*).)

"Appellate review of orders modifying spousal support is governed by an abuse of discretion standard, and such an abuse occurs when a court modifies a support order without substantial evidence of a material change of circumstances." (*McCann*, *supra*, 41 Cal.App.4th at pp. 982–983.)

## II. The Trial Court Properly Concluded the MSA's *Gavron* Provision Was Sufficient to Put Brooks on Notice of the Expectation That She Become Self-Supporting

Brooks challenges the trial court's conclusion that the *Gavron* clause in the MSA provided her with sufficient notice of the expectation that she would become self-supporting. We find no error.

"[I]f a court's initial spousal support award contemplates that a supported spouse will take some action to decrease the

13

need for spousal support following the issuance of the order and the supported spouse fails to take that action, the court may modify the award on the ground of changed circumstances." (*Shaughnessy*, *supra*, 139 Cal.App.4th at p. 1238.) However, a supported spouse must "be made aware of the obligation to become self-supporting" before the spouse's failure to make good-faith efforts to do so can constitute a material change in circumstances. (*Gavron*, *supra*, 203 Cal.App.3d at p. 712.)

Here, the MSA included an unambiguous *Gavron* warning. The clause was titled "*Gavron* Notice" and the provision cited specifically to the *Gavron* case. It unequivocally stated the expectation that Brooks was to seek full-time employment so that she did not remain dependent on spousal support. Further, Brooks's obligation to become self-supporting was presaged by the parties' agreement to exchange updated income and expense declarations in May 2017, and to impute income to Brooks one month later, resulting in a reduced spousal support award.

Indeed, in *Gavron*, the court explained the "prerequisite awareness of the judicial expectation of future self-sufficiency can arise in numerous contexts. For example, there may be an explicit statement by the court at the time of its original support order regarding employment expectations of the supported spouse [citation], a motion and ensuing order that the supported party 'submit to an examination by a vocational training consultant' [citation], a stipulated agreement which addresses the [supported spouse's] ability to obtain future employment [citation], or a justified assumption of continued future employment based on the supported spouse's employment during the parties' separation and at the time of the original support

14

order which contained a reasonable termination date for support." (*Gavron*, *supra*, 203 Cal.App.3d at p. 712.)

Here, the expectation of self-sufficiency was amply communicated to Brooks through the explicit *Gavron* notice in the MSA, as well as the provision requiring the exchange of updated financial information, connected to a definite reduction in spousal support with income to be imputed to Brooks if she was still earning less than she did during the marriage.

Brooks argues the *Gavron* notice was not legally sufficient because it did not explicitly warn her of the "severe negative consequences" of failing to become self-supporting. This argument is unavailing. The central holding in *Gavron* is that a supported spouse must be aware of the expectation that she will become self-supporting. (*Gavron*, *supra*, 203 Cal.App.3d at p. 712.) Subsequent cases have adopted and applied this holding. (See, e.g., *In re Marriage of Maher & Strawn* (2021) 63 Cal.App.5th 356, 362 [recognizing as a *Gavron* warning an admonishment that the supported spouse " 'has an obligation to become self-supporting within a reasonable time' "]; *In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 55 ["what has become known as a '*Gavron* warning' is a fair warning to the supported spouse he or she is expected to become self-supporting"].) That expectation was clearly communicated here.

Nothing in *Gavron* or its progeny, including the cases cited by Brooks, supports the argument that a *Gavron* warning is ineffective unless it explicitly advises of the specific consequences that will result from the supported spouse's failure to make a good-faith effort to become self-supporting. The trial court did not err by finding the unambiguous provision in the MSA

15

sufficient to put Brooks on notice of the "expectation of future self-sufficiency." (*Gavron*, *supra*, 203 Cal.App.3d at p. 712.)

## III. The Trial Court Did Not Abuse Its Discretion When Considering the Section 4320 Factors

A trial court must consider the factors in section 4320 when determining whether a material change in circumstances has occurred.[7] (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1150 (*Left*).)  "The court has discretion as to the weight it gives to

---

[7]	Section 4320 requires courts to consider the following circumstances when issuing an order on spousal support: "(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage . . . .  [¶] (b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.  [¶] (c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.  [¶] (d) The needs of each party based on the standard of living established during the marriage.  [¶] (e) The obligations and assets, including the separate property, of each party.  [¶] (f) The duration of the marriage.  [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.  [¶] (h) The age and health of the parties.  [¶] (i) All documented evidence of any history of domestic violence, as defined in Section 6211, between the parties . . . .  [¶] (j) The immediate and specific tax consequences to each party.  [¶] (k) The balance of the hardships to each party.  [¶] (l) The goal that the supported party shall be self-supporting within a reasonable period of time. . . .  [¶] (m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award . . . .  [¶] (n) Any other factors the court determines are just and equitable."

16

each factor . . . ." (*In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1273 (*Shimkus*).) " ' "[T]he ultimate decision as to amount and duration of spousal support rests within [the trial court's] broad discretion and will not be reversed on appeal absent an abuse of [its] discretion." [Citation.]' [Citation.]" (*Id.* at p. 1273.) But the " ' "court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities." ' [Citation.]" (*Diamond*, *supra*, 72 Cal.App.5th at p. 602.) The court also cannot " 'ignore any relevant circumstance enumerated in the statute.' " (*Ibid.*)

The trial court in this case expressly considered the applicable section 4320 factors in its ruling. Brooks argues on appeal that the court reversibly erred by failing to explain, describe, or expressly address or weigh certain factors under section 4320, including Miller's ability to pay spousal support (§ 4320, subd. (c)), the needs of each party based upon their marital standard of living (*id.*, subd. (d)), each party's obligations and assets (*id.*, subd. (e)), and the health of the parties (*id.*, subd. (h)). This argument lacks merit.

As the court explained in *Diamond*, "[a]lthough by statute the trial court must consider section 4320 factors in deciding whether to modify a spousal support order, the statute does not purport to require the court to address each factor expressly." (*Diamond*, *supra*, 72 Cal.App.5th at p. 602.) The " 'trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support,' " yet the *Diamond* court noted there is no appellate authority for the proposition that the "trial court must expressly identify each factor and set forth in writing or on

17

the record how it has weighed each of them." (*Ibid*.)  Brooks has not provided any such authority in this case.  Further, as the *Diamond* court explained, "the Legislature has required explicit findings in other statutory contexts," and no such language is found in section 4320.  (*Ibid*.)

We agree with the *Diamond* court's reasoning and find it applicable here.  The trial court's express ruling in this case referenced the section 4320 factors, indicating it considered them in its ruling.  No more was required.  Indeed, with respect to several of the factors, Brooks asserts the trial court did not "consider" the factors, when in fact her argument is that the court reached the wrong result.  This court will not "reweigh the evidence and substitute our discretion for that of the trial court," as these "are not legitimate functions of the Court of Appeal."  (*In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 897.)

Brooks further argues the trial court's balancing of the parties' respective hardships under section 4320, subdivision (k) is not supported by substantial evidence because the trial court overlooked both Miller's ability to pay and the "much greater hardship" Brooks would face without support because her physical injuries preclude her from working.  The record does not reflect that the court failed to account for Miller's ability to pay and Brooks's health issues with respect to this factor; in fact, the trial court expressly acknowledged on the record that it was accounting for both.  The trial court assigned little weight to Miller's ability to pay and Brooks's alleged hardship.  That decision is within its discretion.  (*Shimkus*, *supra*, 244 Cal.App.4th at p. 1273.)  And, as stated above, the trial court was not required to make explicit findings regarding the weight it

assigned to each factor.  Brooks has failed to identify any reversible error.

## IV.  Substantial Evidence Supports the Trial Court's Finding That Brooks Did Not Diligently Seek Employment

The trial court found that Brooks's failure to make diligent efforts to become self-supporting constituted a change in circumstances.  Substantial evidence supported the court's factual findings, and we find no abuse of discretion.

A supported spouse makes diligent efforts to become self-supporting by preparing for and seeking gainful employment suited to the spouse's abilities.  (*Shaughnessy*, *supra*, 139 Cal.App.4th at p. 1238.)  "When evidence exists that the party to be supported has unreasonably delayed or refused to seek employment consistent with her or his ability . . . that factor may be taken into consideration by the trial court in fixing the amount of support in the first instance or in modification proceedings." (*In re Marriage of Rosan* (1972) 24 Cal.App.3d 885, 896.) "Whether there has been such unreasonable delay is a question addressed peculiarly to the trial court which heard the party's testimony and observed the party's demeanor at trial."  (*In re Marriage of Sheridan* (1983) 140 Cal.App.3d 742, 749.)  Further, as explained above, if the "initial spousal support award contemplates that a supported spouse will take some action to decrease the need for spousal support following the issuance of the order and the supported spouse fails to take that action, the court may modify the award on the ground of changed circumstances."  (*Shaughnessy*, at p. 1238.)

Viewing the evidence in the light most favorable to the court's order, as we must (*In re Marriage of Catalano* (1988) 204

19

Cal.App.3d 543, 548), the record reflects that when the parties separated, Brooks had been employed for the majority of their 11-year marriage in a retail position. She had most recently worked full time in a managerial position at the LAX Duty Free store. Brooks testified that even when she was no longer working, she traveled with Miller and gave presentations during his business meetings and seminars. There is also evidence that after the accident in 2013, Brooks frequently engaged in physically vigorous activities with Miller before they separated in 2014. The trial court acknowledged Brooks's testimony regarding her ongoing chronic condition. However, the court noted there was no evidence from the treating physician, Dr. Cho, of Brooks's inability to engage in any work at all.

The evidence supported a reasonable conclusion that Brooks had employable skills based on her education and past work experience. Yet, there was no evidence that Brooks attempted to gain employment or become self-sufficient through a means other than photography. Although Brooks considered a career change, she did not enroll in programs or take other concrete steps toward that goal. Brooks also testified that she worked with a recruiter to find employment in 2021, almost seven years after the dissolution, but she applied only to one photography position that she concedes she could not perform full time. Brooks did not testify with any specificity regarding her attempts to pursue any other type of full-time employment. (See *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 ["A trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so"].) Based on the evidence, the trial court could reasonably conclude that Brooks did not make diligent efforts to become self-supporting.

Brooks's reliance on *In re Marriage of Teegarden* (1986) 181 Cal.App.3d 401 (*Teegarden*), for a different result is misplaced. In *Teegarden*, the evidence was undisputed that the husband suffered from lupus and that he received social security disability payments. (*Id.*, at pp. 404, 407.) The parties' financial declarations also showed the husband was on disability. (*Id.* at p. 410.) His caretaker testified at length about his severe impairments as the disease progressed, and the wife testified that the husband stopped working due to the illness and had undergone many unsuccessful treatments. (*Id.* at pp. 408–409.) Further, the parties *stipulated* that the husband was disabled and unable to work. (*Id.* at p. 410.) The trial court found "[t]he nature and extent of any physical or emotional disability claimed by [him] was not established by the evidence," and concluded the husband failed to show an entitlement to spousal support. (*Id.* at p. 409.) The appellate court reversed. The court explained it appeared the trial court engaged in a "wholesale disregard of *all* the testimony before the court" as not credible. (*Id.* at p. 410.) The court reasoned that even if the trial court's disregard of evidence was justified, it was still left with the parties' stipulation that the husband was unable to work, as well as financial declarations establishing the husband was on disability and the wife's income was twice that of the husband. (*Ibid.*) On this record, the trial court's findings were unsupported by the evidence and the denial of spousal support was an abuse of discretion.

Here, in contrast, there was no comparable evidence of Brooks's inability to work. The parties did not stipulate to the fact of her injury or the conclusion that she was completely unable to work. Miller, in fact, offered testimony calling into

21

question the veracity of Brooks's claims of near-total impairment. Brooks's treating physician did not testify that Brooks was unable to work.  Instead, in the letter and declaration he submitted to the court, Dr. Cho indicated only that it would be "difficult to determine when it would be appropriate for [Brooks's] return to work," that she "would benefit from limited activities," and she should not engage in "heavy lifting for the immediate future."  At the hearing, he testified that her prognosis was erratic and her condition "stabilized."  There was no evidence of any other third-party assessment of Brooks's injuries suggesting total or near-total incapacity to work, such as the receipt of social security disability payments, that would indicate she was relieved of the obligation to make diligent efforts to become self-supporting.  Brooks testified that she had not filed for disability. Unlike the trial court in *Teegarden*, the court here did not act in "wholesale disregard" of uncontradicted, credible evidence. (*Teegarden*, *supra*, 181 Cal.App.3d at p. 410.)  *Teegarden* is inapposite.

Finally, Brooks argues the trial court erroneously sustained objections to her counsel's questions on direct examination about the effect of her injuries on her ability to work.  Specifically, Brooks's counsel asked Brooks if her injuries "impair[ed] [her] ability to work" full time and part time, and if her chronic pain "impaired [her] ability to be successful in the photography business."  The court sustained Miller's objections to the questions based on lack of foundation and speculation.

We review the trial court's rulings on evidentiary objections for abuse of discretion.  (*Marin v. Department of Transportation* (2023) 88 Cal.App.5th 529, 536 [evidentiary ruling reversed only if appellant shows trial court exercised its discretion in an

22

arbitrary, capricious or patently absurd manner resulting in miscarriage of justice].) "[E]videntiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court." (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226.)

The trial court could reasonably conclude that additional foundation was necessary to establish Brooks had the knowledge or experience necessary to competently answer the questions posed. Brooks is a relatively inexperienced photographer with no vocational training or medical expertise. The examination leading up to the challenged questions did not establish that Brooks had sufficient personal knowledge to testify about success in the photography business, or whether accommodations were possible that could allow her to still perform in that role. Further, the preceding examination did not establish that Brooks could competently opine on whether or to what extent she could perform full-time or part-time work other than photography. After the court sustained Miller's objections, Brooks's counsel did not attempt to lay additional foundation for the questions.

The trial court's evidentiary rulings were thus not arbitrary, capricious, or patently absurd. Witnesses must possess sufficient knowledge to assess a person's ability to obtain employment based on age, health, education, skills, employment history, and the current availability of employment opportunities in the job market. (See, e.g., § 4331, subds. (a) & (d) [establishing that vocational training counselor must possess "sufficient knowledge, skill, experience, training, or education" to assess "the party's ability to obtain employment that would allow the party to maintain their marital standard of living"].) Brooks

23

could, and did, testify about her injuries, her past employment, and that her injuries kept her from working.

Moreover, even if the trial court erred by excluding the testimony, we would find any error harmless. On cross-examination, Brooks testified that she was unable to work. The court heard Brooks's testimony offering her own view of her abilities. Thus, even if the court erroneously sustained Miller's objections to two questions, we would find no basis for reversal.[8]

Substantial evidence supported the trial court's conclusion that Brooks did not make diligent efforts to become self-supporting. Because the parties' MSA clearly articulated the expectation that Brooks would become self-supporting, her failure to diligently pursue employment constituted a material change in circumstances supporting an order terminating support. (*Gavron*, *supra*, 203 Cal.App.3d at p. 712.)

## V. The Trial Court Did Not Abuse Its Discretion by Terminating Its Jurisdiction over Spousal Support

Brooks argues the trial court abused its discretion by terminating its jurisdiction over spousal support in a marriage of a long duration. We disagree.

Under section 4336, subdivision (a), courts retain jurisdiction indefinitely over spousal support "where the marriage is of long duration," except when terminating spousal support. The statute expressly states that it does not "limit[ ] the

---

[8]    Brooks did not attempt to elicit testimony from Dr. Cho regarding restrictions on her ability to work. Further, neither Dr. Cho's letter nor his declaration explained how Brooks's injuries impaired her from performing duties specific to any particular job, including those of her previous retail management positions.

court's discretion to terminate spousal support in later proceedings on a showing of changed circumstances." (§ 4336, subd. (c); *In re Marriage of Christie* (1994) 28 Cal.App.4th 849, 858 [§ 4336 means only "that the court retained jurisdiction indefinitely until it entered 'a court order terminating spousal support' "].) Here, the trial court terminated support based on changed circumstances and we have concluded it did not abuse its discretion in doing so. The court therefore properly terminated its jurisdiction.

## VI. The Trial Court Did Not Err by Making the Termination of Support Retroactive

Brooks additionally contends the trial court erred by making its order terminating support retroactive to the date Miller filed his request in 2019, without considering her income. The trial court did not abuse its discretion. (*Left*, *supra*, 208 Cal.App.4th at p. 1152 ["[a]n order making a modification retroactive to a certain date is reviewed for abuse of discretion"].)

Section 3653, subdivision (a) permits a trial court to make an order terminating support retroactive to the date of the filing of the notice of the motion to terminate. Although there are no "explicit statutory standards controlling decisions about retroactivity," a trial court's exercise of discretion under the statute is based on " 'the equitable rights of the parties in light of their economic needs and abilities' during the period for which a retroactive" order is sought. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 312.)

Here, the trial court had already taken into consideration the *Gavron* warning in the MSA which placed Brooks on notice years earlier of the expectation that she would become self-supporting; Miller's declaration regarding his decreased income

as of the time the request for order was filed; and its own reasonable conclusion that Brooks failed to make diligent efforts to secure full-time or significant employment in the nearly five years prior to Miller's request for an order terminating support. We find no abuse of discretion.

## VII.  The Trial Court Did Not Err in Failing to Issue a Statement of Decision

Brooks argues her request for a statement of decision was timely and the trial court reversibly erred by denying the request.  We disagree.

The court properly denied Brooks's request as untimely. While section 3654 does not set forth specific timelines for a party to request a statement of decision, under section 210, "except where any other statute or judicial council rule is applicable, '[t]he rules of practice and procedure applicable to civil actions generally apply to, and constitute the rules of practice and procedure in, proceedings under [the Family Code].' " (*Rojas v. Mitchell* (1996) 50 Cal.App.4th 1445, 1451–1452, citing § 210; see *Shimkus*, *supra*, 244 Cal.App.4th at p. 1278 [citing both § 3654 and Code of Civ. Proc., § 632 in resolving statement of decision issue]; *In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1248 [same].)  Indeed, Brooks offers no support, and we find none, for the proposition that requests under section 3654 made before signing and entry of a final order are timely because Code of Civil Procedure section 632 does not apply.

Under Code of Civil Procedure section 632, a party must request a statement of decision "within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to

26

the submission of the matter for decision."  The same provision mandates that a statement of decision be in writing unless the "the trial is concluded within one calendar day or in less than 8 hours over more than one day, [in which case] the statement of decision may be made orally on the record in the presence of the parties."  (Code Civ. Proc., § 632.)

Brooks concedes that the parties do not agree on whether the evidentiary hearing was more or less than eight hours and that "neither side is able to document by way of existing admissible evidence the duration of the trial."  "[I]t is the appellant's burden to provide an adequate record on appeal that affirmatively demonstrates error."  (*Crasnick v. Marquez* (2016) 248 Cal.App.4th Supp. 1, 9.)  Because Brooks has failed to provide an adequate record to show that the evidentiary hearing lasted longer than eight hours, we presume it did not.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown' "].)

Brooks was therefore required to request a statement of decision under section 3654 before the matter was submitted for decision, per Code of Civil Procedure section 632.  Brooks made her request almost a month after the trial court's ruling.  The trial court did not err by denying Brooks's request for a statement of decision as untimely.

Moreover, even if the trial court erred in finding Brooks's request untimely, we would find no basis for reversal.  The California Supreme Court has conclusively held that "a trial court's error in failing to issue a requested statement of decision [under Code of Civil Procedure 632] is not reversible per se, but is

27

subject to harmless error review." (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.) Citing article VI, section 13 of the California Constitution and Code of Civil Procedure section 475, our high court held that a trial court's failure to issue a statement of decision is reversible in civil cases only upon a showing of prejudice. (*Id*. at pp. 1108–1109.)

"The primary purpose of a statement of decision is to facilitate appellate review." (*People v. Landlords Professional Services, Inc*. (1986) 178 Cal.App.3d 68, 70.) Here, the basis for the trial court's ruling was clear because the court made explicit findings on the record. The transcripts of this ruling, the evidentiary hearing that preceded it, and the materials provided in the appellant's appendix provide a ready basis for review of the trial court's order terminating support.

A statement of decision, moreover, is not required to detail every aspect or basis of a court's ruling. Indeed, "[a] statement of decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124–1125.) Here, the court's oral ruling leaves no question that the court considered all factors under section 4320 and made all necessary findings for its judgment. Because Brooks fails to affirmatively show any prejudice resulting from the absence of a statement of decision, we would find no basis for reversal in the trial court's denial of Brooks's request for a statement of decision.

## DISPOSITION

The order is affirmed.  Respondent Jason Miller is entitled to costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

ADAMS, J.

We concur:

LAVIN, Acting P. J.

EGERTON, J.