Filed 6/9/26  Marriage of V.S. and V.K. CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of V.S. and V.K. | H052345<br>(Santa Clara County<br>Super. Ct. No. 19FL002753) |
| V.S.,<br><br>    Respondent,<br><br>    v.<br><br>V.K.,<br><br>    Appellant. | |

V.S.[1] and V.K. are former spouses who share a minor child.  V.S. filed a request for a domestic violence restraining order (DVRO) against V.K. pursuant to the Domestic Violence Prevention Act (DVPA) (Fam. Code,[2] § 6200 et seq.), which the trial court granted for one year.  V.S. filed a request to permanently renew the DVRO.  The court granted V.S.'s request for renewal but for a period of five years (renewal order).

---

[1] Because this case involves proceedings under the Domestic Violence Protection Act, we refer to the parties by their initials to protect the privacy interests of protected persons.  (Cal. Rules of Court, rule 8.90(b)(1), (11).)

[2] All further unspecified statutory references are to the Family Code.

V.K. appeals the renewal order on the grounds the trial court erred by denying his request for a statement of decision under Code of Civil Procedure section 632, admitting a settlement communication in contravention of Evidence Code section 1152, refusing to consider evidence of the renewal order's impact on him, and applying the incorrect legal standard in evaluating V.S.'s renewal request. V.S., in turn, contends V.K.'s appeal is frivolous and requests this court impose sanctions against him.

For the reasons explained below, we affirm the renewal order and deny V.S.'s request for sanctions.

## I. FACTS AND PROCEDURAL BACKGROUND[3]

*A. Facts*

V.S. and V.K. married in July 2013. (*In re Marriage of V.S. & V.K.* (2023) 97 Cal.App.5th 219, 239.) V.S. filed a petition for dissolution of the marriage in July 2019, which was served on V.K. on or about August 1, 2019, and their marriage was dissolved in May 2024. V.S. and V.K. share a minor child (the child), who is currently nine years old.

V.S. is a psychiatrist and, during their marriage, she prescribed to V.K. lithium carbonate, lamotrigine, and metformin.

On August 3, 2019, the child (then two years old) was with V.K. for scheduled visitation. That morning, V.K. sent V.S. a message demanding V.S. give V.K. "1/2 of [the child's] time. If [he] d[id] not get that, [he] prefer[red] to die." V.S. had expected V.K. to return the child to her by 7:30 p.m., which V.K. did not do.

That evening, V.K. and V.S. engaged in a text message conversation in which V.K. threatened not to return the child to V.S. and expressed suicidal

---

[3] "We summarize the facts in the light most favorable to the judgment." (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1405.)

2

thoughts. At 9:53 p.m., V.K. sent V.S. a message stating, "I do not know how long I will be around." At 10:06 p.m., V.K. sent V.S. a message stating, "You will never see [the child] again if you do not tell me why you showed no remorse for 10 years," referring to V.S.'s prior relationship with a boyfriend. Four minutes later, V.K. shared his live location. At 10:21 p.m., V.K. sent V.S. a message stating, "I don't have much time . . . give me the truth" about the frequency of her sexual relations with her former boyfriend, and another stating that he was "ready to go . . . [t]o sleep." At 10:41 p.m., V.K. sent V.S. a message stating, "I and [the child] are finally at peace. [The child] gave me more happiness in the last 4 Saturdays that I travelled with [the child] th[a]n you ever could."

In response to V.S.'s text messages expressing concern about the use of the term "at peace" and the child's safety, V.K. responded that he was "sending [the child] back . . . obviously I will not take [the child] with me." Between 10:48 p.m. and 11:09 p.m., V.K. sent V.S. messages stating, "It's better to die th[a]n to know my wife thought it was normal to suc[k] a man's dick 10 times before marriage," "I can call 911 before going to sleep and they can take [the child] back," and "you can get [the child] from [T]reasure [I]sland [the child] will be in the car backseat."

V.S. called the police after V.K. stated that he would not return the child and made suicidal statements. Around 11:30 p.m., V.S. and her brother-in-law found V.K. and the child in San Francisco, and V.S. took the child home with her.

One morning in February 2021, V.K. temporarily physically blocked V.S. from leaving with the child and told V.S. that they could not leave; he relented when V.S. and the child began crying. V.K. explained that he

3

believed V.S. was not authorized to pick up the child before 10:00 a.m. that day, and V.S. had arrived to pick up the child an hour early.

On July 21, 2021, V.S. learned from the child's au pair that V.K. had taken the child for lunch and said he would be keeping the child with him until 4:00 p.m. that day, despite it not being his visitation day. V.S. went to V.K.'s residence and called for the child from the doorway, but V.K. had told the child's au pair to stay in the backyard with the child because he did not want the child to leave with V.S. The parties disputed whether V.K. compelled V.S. to leave the premises using physical force, and they gave conflicting reports to the police officers who responded to an emergency services call from V.S. V.S. contended that V.K. "push[ed] and shov[ed] [V.S.] away from the front door" and down the driveway, yelled at her " 'get out of here bitch,' " and punched her arm with a closed fist. As V.S. was calling and speaking to emergency services, V.K. hit her again. V.K. denied that the parties ever made physical contact during the incident.

*B. Procedural Background*

1. <u>DVRO</u>

On July 30, 2021, V.S. filed a request for a DVRO against V.K. V.S. alleged in her request that V.K. was emotionally and verbally abusive in that he "would yell at [her] and call [her] names," "insisted that [she] should apologize for having a romantic relationship with someone before him" and "show regret" for having had that relationship, believed she "should rub [her] nose on the floor," "shove[d] [her] and stop[ped] [her] from leaving [their] house by blocking [her] path with his body," and interfered with her ability to run their two businesses. V.S. asserted that sometimes her "only option to get to safety was to lock [her]self in [their] bathroom for hours."

4

V.K.'s verbal abuse of V.S. extended to text messages he sent to her, in which he called her derogatory terms, accused her of stealing from him, and threatened her medical license. V.S. provided examples of such messages, including ones in which V.K. wrote "Is there enough space in hell for you?," called V.S. a "stinking ass bitch," wrote "I will spend $10,000 to make sure you don't get $1 ... you are a [snake emoji] [gold emoji] digger," told her that her "first boyfriend was so smart that he refused to marry your sorry ass after you cried and begged him," and threatened to "make sure [V.S. loses her] medical license if that is the last thing [he does] before [he] die[s]."

V.S. contended that V.K. "has a history of major depression and suicidality," and he had twice told V.S. about his thoughts of committing suicide. After a second disclosure of suicidal thoughts, in October 2018, V.S. took V.K. to an emergency room, and he was placed on a Welfare and Institutions Code section 5150[4] hold and admitted for observation. In support of her request for a DVRO, V.S. recounted, among other instances, the August 2019, early 2021, and July 2021 incidents. In addition, she asserted that, after the August 2019 incident, V.K. was again put on a Welfare and Institutions Code section 5150 hold, and that, after a scheduled visit between V.K. and their child in April 2021, V.K. "refused to return [the child's] travel identification card" to V.S., causing V.S. concern that V.K. would abduct their child. V.S. stated that, since the July 2021 incident, she

_____

[4] If authorized personnel, such as a peace officer, determines that "a person, as a result of a mental health disorder, is a danger to others, or to themselves," the authorized personnel may take that person "into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment." (Welf. & Inst. Code, § 5150, subd. (a).)

5

has had trouble sleeping because she fears V.K. harming her or her family, abducting the child, or hurting himself.

On July 30, 2021, the trial court granted V.S. a temporary restraining order (TRO) against V.K. In late November 2022, the court conducted a three-day hearing on V.S.'s request for a DVRO. V.S. asserted that V.K. had verbally abused her since "the beginning" of their relationship, persistently questioned her regarding her prior sexual relationship, prevented her from leaving their apartment, and insisted that she prescribe psychiatric medications to him. If V.S. did not prescribe medications V.K. requested, he would "be mean to [her], passive/aggressive, sulking." She also testified regarding the August 2019, February 2021, and July 2021 incidents. V.S. asserted that she was scared that V.K. may harm her in the future.

V.S. also presented the testimony of the child's au pair and responding officers regarding the July 2021 incident. The child's au pair testified that V.K. instructed her to stay in the backyard with the child because he did not want the child to leave with V.S. Responding police officers stated that, when they arrived on scene, V.S. "seemed visibly upset" and had been crying, and V.S. told them V.K. had shoved and punched V.S. V.K. told the police that he had not touched V.S., and V.S. never made physical contact with V.K.

V.K. asserted that his prior actions were driven by his medicated state, which he was no longer in, after "taper[ing] down" his use of medications between January 2020, and December 2021, with the help of a different doctor whom he saw between April 2018, and December 2021. He maintained that he was no longer taking any mental health medications and was not diagnosed with any mental health issue.

On cross-examination, V.K. acknowledged that his prescription history indicated that, between 2018 and 2022, he picked up—or someone picked up

6

on his behalf—prescriptions or refills for lithium carbonate, lamotrigine, and metformin prescribed to him by other doctors (not V.S.) in dosages equivalent to or higher than dosages V.S. had prescribed to him.

V.K. contested V.S.'s claims about his suicidal tendencies during the August 2019 incident and physical abuse during the July 2021 incident. Although V.K. initially confirmed that he was "ready to end [his] life" and "had written [his] goodbye letters" on August 3, 2019, he later stated during cross-examination that he was suicidal during that week and that month, but not on that specific day.

V.K. admitted that he had not told the police "the complete truth" regarding the incident in July 2021, because he "wanted to understate the incident as much as possible because [he] didn't want [the] incident to blow up." He testified that he did not punch V.S. on July 21, 2021, and that V.S. pushed him to try to get to the backyard.

Following the three-day hearing, the trial court granted V.S. a one-year DVRO protecting her and the child, based on V.K.'s withholding of the child from visitation and making suicidal threats in front of the child. Although the court initially found that the July 2021 "incident was overblown and d[id] not constitute the type of domestic violence that supports a domestic violence restraining order request," the court subsequently modified its finding. As restated, the court found that the incident on July 21, 2021, supported its finding of domestic violence, but the incident was "not a substantial factor" or a "significant element" in the court's decision to grant the DVRO.

The DVRO prohibited V.K. from contacting V.S. and the child "either directly or indirectly, by any means, including, but not limited to, by telephone, mail, e-mail, or other electronic means." The DVRO ordered V.K. to stay 300 yards away from the protected persons, their home, job, vehicle,

and school or childcare. The order made an exception for "[b]rief and peaceful contact as required for court-ordered visitation" with the child The trial court ordered that V.S. have sole legal and physical custody of the child.

## 2. DVRO Renewal Request

In 2023, V.S. filed a form DV-700 request to renew the DVRO, together with supporting documents. V.S. requested the trial court renew the DVRO for her lifetime.

V.S. alleged that the facts underlying the original request for a DVRO were "severe" and that V.K. had subsequently violated the terms of the DVRO multiple times in his communications with her. V.S. asserted that V.K. repeatedly violated the DVRO by sending "prohibited" communications to her through the Our Family Wizard messaging platform, and the messages were neither related to visitation nor "brief and peaceful." For example, in one Our Family Wizard message discussing visitation, V.K. threatened to withhold the child from V.S. On November 23, 2023 (a Thursday), V.K. threatened to keep the child through the Thanksgiving weekend ("you [(V.S.)] can have [the child] on Monday morning"), in contravention of the agreed upon custodial schedule.

In addition, V.S. asserted that V.K. had violated the terms of the DVRO several times by volunteering for activities at their child's school throughout the 2022–2023 school year, including signing up to take the child "on every single field trip for the school year" and signing up to volunteer with the child's scout troop, which meets at the child's school. V.S. included in her filing the transcript from a June 13, 2023 hearing in the trial court (before the same bench officer presiding over her DVRO renewal hearing) during which the court found it "very clear" that V.K. violated the DVRO by going to the child's school.

8

V.S. maintained that V.K. was also engaging in more "covert" acts of abuse, such as using persons or entities controlled by V.K. or his family (such as GRMTech[5]) to file or threaten to file lawsuits in 2023, against V.S. for care she provided in 2017, and file an unlawful detainer action against V.S. to evict her from a home V.S. and V.K. purchased together while married. V.S. also asserted that, after V.K. helped her and her partner retain a contractor to do work on V.S.'s then-residence, V.K. "complained to the City of Palo Alto about unpermitted construction" at the residence, resulting in an inquiry by the city inspector.[6]

The trial court conducted a hearing on the DVRO renewal request, which lasted five hours over the course of three days, ending on May 17, 2024.

In her opening argument, V.K.'s counsel stated that renewal of the DVRO would affect V.K.'s "future career. He is interested in teaching, so if we have a lifelong DVRO against him, whether it's evidence of him being violent or emotional or physical abuse, this will affect his future career and affect what he could earn to support [the child]." In response, the trial court stated that it would not hear evidence on whether the renewal of the DVRO would impact V.K.'s "professional aspirations" because it was "not a relevant issue."[7]

_____

[5] The court-appointed receiver handling the parties' three community businesses concluded that GRMTech was a company that operated "at the direction of [V.K.] and his family."

[6] During the DVRO renewal hearing, V.S.'s partner testified that the complaint from the City of Palo Alto contained photographs that V.K. asked the contractor to take of the work and sent to V.S. and her partner on a group chat.

[7] During an earlier hearing on V.K.'s request for attorney fees, the same bench officer who presided over the DVRO renewal hearing observed

During his testimony, V.K. acknowledged violating the DVRO by going to the child's school (though he asserted he had "made those acknowledgments by mistake"). V.K. also confirmed that he had read the DVRO and was aware that the DVRO required him to stay away from the people and places identified in the order, and that there are exceptions allowing him to "briefly and peacefully" exchange the child at the court-ordered visits.

V.S. testified that she is afraid to open V.K.'s messages to her—which she characterized as critical and placing pressure on her—because his messages could "be something harassing," and, if it is, "it sometimes causes [her] to have palpitations," "a pit in [her] stomach," to "feel anxious" and "stuck about what to do and how to respond," and "prevents [her] from being present in [her] life." She is more distressed about these messages when the child is with V.K. because she is concerned V.K. would take the child away from her and not let her see the child again, otherwise withhold the child from her, or arrange for medical treatment of the child without V.S.'s knowledge and permission. V.S. testified that some of this fear stems from the August 2019 incident and other occasions in which V.K. withheld the child from her in February 2021, May 2021, and November 2023.

V.S. stated that she believes V.K. continues to pose a threat to her and that he is still "[v]ery" angry at her, potentially more so, based on the tone of

---

that V.K., who represented that he had applied to a "hundred jobs" while also "trying to make [his] start-up work," had previously testified that he "could make money like a regular person but [he's] overqualified and so it's difficult, and so [he's] hoping to have some huge paying job or start [his] own company." The trial court stated that it was "inequitable or unfair" for V.K. to seek attorney fees when he had "elected to engage in a form of employment that may yield huge money, it may not" because "part of what [he] elected to do is to not receive income at this time."

his communications with her and his threat to her medical license. On cross-examination, V.K.'s counsel asked how V.K. threatened V.S.'s license to practice medicine. V.S. responded that V.K. e-mailed V.S.'s attorney saying that he was going to file a complaint with the medical board, sent her a message that he was going to report her to the physician's association, and texted her that he would ensure that she loses her license. V.K.'s counsel requested that V.S. show the trial court some evidence of threats from V.K. to V.S.'s license. V.S. read into the record a January 18, 2024 e-mail from V.K. to V.S.'s counsel (the January 18 e-mail)—marked "settlement confidential" and "[n]ot to be disclosed in court"—in which V.K. offered not to file the medical malpractice lawsuit attached to the e-mail if V.S. agreed to withdraw her request to renew the DVRO. V.S. testified that the message made her concerned about what further financial and emotional distress she would have to go through. V.K.'s counsel did not object to V.S.'s testimony about the January 18 e-mail.

Because V.K.'s counsel "solicited and accepted testimony as to the contents of [the January 18] e-mail," the trial court ruled that V.K. had waived any objection to the admissibility of the e-mail under Evidence Code section 1152 and admitted it into evidence. In addition, the court, in response to V.K.'s counsel's request that the court make a finding as to whether the language in the January 18 e-mail constituted a direct threat, concluded that such a finding was neither necessary nor relevant. The court stated that V.S.'s "subjective impression of the contents of the writing" was relevant to the court's assessment of whether V.S.'s impression supports "a reasonable apprehension of future abuse."

At the end of the second day of the hearing (April 15, 2024), the trial court stated that it was "tentatively . . . prepared to grant" V.S.'s request to

11

renew the DVRO because it found the evidence "firmly establishes ongoing reasonable apprehension of fear" and the standard for renewal "is extremely low."

Between the second and third days of the hearing, on April 19, 2024, V.K.'s counsel sent an e-mail to V.S.'s counsel suggesting the parties "enter into a mutual, lifelong stipulation of no contact" between them, with all communications handled by their counsel. V.K.'s counsel suggested this stipulation "would take the place of pursuing additional DVRO hearings." V.K. proposed this option because he was concerned about his startup company being "passed over" for funding and his inability to secure employment. He suggested that, if he was "able to secure funding and advance his career, his need for spousal support and attorney fees [would] likely diminish."

On the third day of the hearing, V.K. requested a statement of decision from the trial court. The court denied the request on the grounds that it was "untimely and does not meet the statutory guidelines for an entitlement to a statement of decision."

At the end of the hearing, the trial court found that V.S. had established by a preponderance of the evidence that she continued to entertain a reasonable apprehension of future abuse from V.K. The court based its finding on text messages V.K. sent V.S.; threats V.K. made to V.S., including threats to her medical license; the instances in which V.K. withheld the child from V.S., causing V.S. to fear V.K. may, in anger, "take [the child] away and not return [the child], in the same fashion that he did in the past"; V.K.'s "demeanor and emotional reaction" during cross-examination, which the court characterized as being akin to the type of emotion that concerned

12

V.S.; and "the totality of the circumstances in evidence." The court granted V.S.'s request to renew the DVRO but limited its duration to five years.

## II.  DISCUSSION

On appeal, V.K. asserts the trial court committed procedural and legal errors.  V.K. contends that the court erred by denying as untimely his request for a written statement of decision under Code of Civil Procedure section 632 on the ground that he submitted the request " 'prior to the submission of the matter for decision,' " in accordance with the statute.  He asserts that the court also erred under Evidence Code section 1152 in admitting over his objection[8] the January 18 e-mail.

V.K. additionally maintains that the trial court erred by refusing to consider evidence of the DVRO's impact on V.K., in contravention of the third factor in *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275 (*Ritchie*).  He also argues that the court applied the incorrect legal standard in evaluating V.S.'s renewal request by focusing on V.S.'s " 'subjective impression' " rather than the objective test of a " 'reasonable woman in the same circumstances' " as prescribed by *Ritchie*.  V.K. contends the court also erred by impermissibly considering evidence that antedated the issuance of the original DVRO, and failing to consider evidence of changed circumstances, including the "absence of any physical violence allegations since the original [TRO]," V.K. being "medication free," and V.S.'s refusal to accept V.K.'s offer of a lifelong no

---

[8] In his reply brief, V.K. argues that, even if he forfeited his objection to the admission of the January 18 e-mail, the trial court's reliance on the statements made in the e-mail constituted structural error.  Because V.K. makes this argument for the first time in his reply brief and has not offered any explanation for not presenting it earlier, it is untimely and we do not consider it.  (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)

13

contact order in exchange for V.S. withdrawing her request to renew the DVRO.

V.S. disputes V.K.'s contentions of error.[9]

*A. Principles of Appellate Review*

Well-established principles of appellate review guide our analysis. "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 (*Jameson*), citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) As the appellant, V.K. bears the burden of showing that the trial court committed an error that justifies reversal of the judgment. (*Jameson*, at p. 609; see also *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 110, fn. 1.)

"To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*).) When an appellant asserts a point on appeal " 'but fails to support it with reasoned argument and citations to authority' " (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862) or fails to support it with appropriate record citations (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887; Cal. Rules of Court, rule 8.204(a)(1)(C) [requiring parties to

---

[9] In addition, V.S. asserts that this court should strike V.K.'s appellant's appendix on the ground that, because it "lack[s] critical documents," it is noncompliant with the California Rules of Court. Given that the parties have briefed the issues before us, we exercise our discretion to disregard V.K.'s noncompliance with the appellate briefing rules and address the merits of his claims. (Cal. Rules of Court, rule 8.204(e)(2)(C).)

"[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]), this court may treat the point as forfeited. We are not required to search the record for error ourselves (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246), and "[w]e are not bound to develop appellants' arguments for them." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) In short, "conclusory claims of error will fail." (*S.C.*, at p. 408.)

In reviewing the trial court's findings, the appellate court has " 'no power to judge [] the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' " (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518; *S.C.*, *supra*, 138 Cal.App.4th at p. 415; *In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1200.) " ' " '[I]t is the exclusive province of' " ' " the trial court " ' " 'to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' " ' " (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968) because the trial court, as the trier of fact, " ' "is in a superior position to observe the demeanor of witnesses." ' " (*People v. Nishi* (2012) 207 Cal.App.4th 954, 965; see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008 (*O.B.*).)

"We do not review the trial court's reasoning, but rather its ruling. A trial court's order is affirmed if correct on any theory, even if the trial court's reasoning was not correct." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15–16 (*J.B. Aguerre*).)

*B. Statement of Decision*

V.K. asserts that the trial court erred by denying his timely request for a written statement of decision. We disagree.

15

The trial court denied V.K.'s request for a written statement of decision on two grounds, timeliness and failure to "meet the statutory guidelines for an entitlement to a statement of decision."  Code of Civil Procedure section 632, subdivision (a) states that "written findings of fact and conclusions of law shall not be required" in trials of questions of fact.  However, the trial court "shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial." (*Ibid*.)  The party requesting the statement must do so "within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision." (*Ibid*.)

Although a statement of decision must generally be in writing, "when the trial is concluded within one calendar day or in less than 8 hours over more than one day, the statement of decision may be made orally on the record in the presence of the parties."  (Code Civ. Proc., § 632, subd. (b).)

When interpreting a statute, the reviewing court gives the language its plain and commonsense meaning.  (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.)  If the statutory language is clear, the reviewing court " ' " ' "must generally follow its plain meaning." ' " ' " (*Ibid*.)  We review the interpretation of statutes de novo.  (*Wentworth v. Regents of University of California* (2024) 105 Cal.App.5th 580, 597; *In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1145.)

The trial court conducted the DVRO renewal hearings in five hours over the course of three days, concluding it in fewer than eight hours.  Thus, the court was entitled to make its statement of decision orally in the presence

16

of the parties. (Code Civ. Proc., § 632, subd. (b).) As the court orally pronounced its decision to the parties, we discern no error in the court's denial of V.K.'s request for a written statement of decision. (See *J.B. Aguerre*, *supra*, 59 Cal.App.4th at pp. 15–16.)

Even assuming arguendo that the trial court erred in failing to issue a written statement of decision, we are not persuaded by V.K.'s assertion of prejudice. V.K. objects to the court's oral pronouncement of its statement of decision on the ground that it is "shrouded in ambiguity" because it did not identify, inter alia, "how heavily the court relied on" certain evidence, "which specific [Our Family Wizard] messages the court found problematic," and "how these messages created a reasonable apprehension of future abuse."

"A statement of decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision. [Citations.] '[A] trial court rendering a statement of decision under . . . [Code of Civil Procedure] section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them. [Citation.]' [Citations.] In other words, a trial court rendering a statement of decision is required only to set out ultimate findings rather than evidentiary ones." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124–1125.) The trial court's explanation of its ruling set out its ultimate findings. Therefore, V.K. has not shown prejudicial error in the court's treatment of V.K.'s request for a written statement of decision.

17

*C. January 18 E-mail*

V.K. contends that the trial court violated Evidence Code section 1152 by admitting into evidence the January 18 e-mail because it contained a settlement offer. V.S. responds that V.K. forfeited his objection to the admission of the e-mail when his counsel solicited and accepted testimony from V.S. regarding the e-mail. In reply, V.K. contends that his counsel only examined V.S. on the e-mail "after the court indicated it would admit the evidence, by allowing [V.S.] to testify about its contents without sustaining the objection." V.K. argues that cross-examining a witness "on the admitted evidence does not waive the objection." We are not persuaded.

Contrary to V.K.'s contention, the trial court did not admit the January 18 e-mail into evidence until after V.K.'s counsel questioned V.S. regarding its contents and its impact on her. The court stated that it was admitting the e-mail into evidence *because* V.K.'s counsel had forfeited her objection to the e-mail by "solicit[ing] and accept[ing] testimony as to the contents of [the January 18] e-mail." We discern no abuse of discretion[10] on the part of the court in its evidentiary ruling. (See, e.g., *Regents of University of California v. Sumner* (1996) 42 Cal.App.4th 1209, 1213, superseded on another ground by statute; see also *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 33–34.)

*D. DVRO Renewal*

1. <u>Legal Principles</u>

A DVRO "may be renewed, upon the request of a party, either for five or more years, or permanently, at the discretion of the court, without a showing of further abuse since the issuance of the original order." (§ 6345,

---

[10] *In re Marriage of M.P. & M.C.* (2025) 116 Cal.App.5th 1096, 1107.

subd. (a); *Navarro v. Cervera* (2025) 108 Cal.App.5th 229, 237 (*Navarro*); *G.G. v. G.S.* (2024) 102 Cal.App.5th 413, 421 (*G.G.*).)

"The ability to renew a DVRO without a showing of further abuse is one part of a comprehensive statutory response to domestic violence, which the Legislature has identified as 'the number one health risk among women.' [Citation.] The scheme is 'broad' in its intent, and each section must therefore be broadly construed to accomplish its purpose." (*G.G.*, *supra*, 102 Cal.App.5th at p. 421; see also § 6301, subd. (d) ["The length of time since the most recent act of abuse is not, by itself, determinative. The court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief."].)

For purposes of the DVPA, "[a]buse is not limited to the actual infliction of physical injury or assault" (§ 6203, subd. (b)) and includes conduct that "place[s] a person in reasonable apprehension of imminent serious bodily injury to that person or to another" (*id.*, subd. (a)(3)) and "behavior that has been or could be enjoined pursuant to [s]ection 6320" (*id.*, subd. (a)(4)). Behaviors that may be enjoined pursuant to section 6320, subdivision (a) include, as pertinent here, "harassing, . . . contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members."

The phrase " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts,

19

text messages, internet-connected devices, . . . or other electronic technologies." (§ 6320, subd. (c).) Such "conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (*Ibid*.) "Examples of coercive control include, but are not limited to, unreasonably engaging in any of the following: [¶] . . . [¶] (3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services. [¶] (4) Compelling the other party by force, threat of force, or intimidation . . . to engage in conduct from which the other party has a right to abstain or to abstain from conduct in which the other party has a right to engage." (*Ibid*.)

Under *Ritchie* and its progeny, to renew or extend a DVRO, the trial court "must find the probability of future abuse is sufficient that a reasonable woman (or man, if the protected party is a male) in the same circumstances would have a 'reasonable apprehension' such abuse will occur unless the court issues a protective order." (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1288; *Rybolt v. Riley* (2018) 20 Cal.App.5th 864, 874 (*Rybolt*).) " ' "[T]his does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." ' " (*Rybolt*, at p. 874, quoting *Lister v. Bowen* (2013) 215 Cal.App.4th 319, 332–333 (*Lister*).) "Put another way, the question is whether a reasonable person, in the petitioner's circumstances, would fear repetition of the abuse if the order expired." (*G.G.*, *supra*, 102 Cal.App.5th at p. 421.) To answer that question, courts must or may (depending on the circumstances) consider three factors. (*Ibid*.)

"First, courts must consider the factual predicate for the original DVRO—the evidence and any findings on which it was based." (*G.G.*, *supra*, 102 Cal.App.5th at p. 421, citing *Ritchie*, *supra*, 115 Cal.App.4th at p. 1290.) Although the existence of the DVRO, by itself, rarely is sufficient to demonstrate that the order should be renewed, "the findings and facts which supported making the order 'often will be enough in themselves' to justify renewing it later." (*G.G.*, at pp. 421–422, citing *Ritchie*, at p. 1291.) "[T]he trial court should not permit the restrained party to challenge the truth of the evidence and findings underlying the initial order." (*Ritchie*, at p. 1290.)

"Second, courts must consider any significant change in circumstances that occurred after the DVRO was issued. [Citation.] If the protected and restrained parties have 'moved on with their lives,' in a way that lessens the opportunity for or likelihood of future abuse, the need for the order may have dissipated. [Citation.] On the other hand, if little has changed or there is now an increased possibility of abuse, the need for the order continues." (*G.G.*, *supra*, 102 Cal.App.5th at p. 422, citing *Ritchie*, *supra*, 115 Cal.App.4th at p. 1291.) When considering this factor, "courts must do more than simply ask whether the restrained person has violated the terms of the order. An order that has never been violated may still be renewed." (*G.G.*, at p. 422.)

Third, trial courts may consider "whether, and how much, the DVRO burdens the restrained party." (*G.G.*, *supra*, 102 Cal.App.5th at p. 422; *Ritchie*, *supra*, 115 Cal.App.4th at p. 1291 ["[T]he 'burdens' the protective order imposes on the restrained party . . . may or may not be a relevant factor in the trial court's consideration of a contested request for renewal of a protective order."].) The relevance of this factor depends "on whether there is a risk of physical abuse." (*G.G.*, at p. 422.) "On the one hand, 'the physical

21

security of the protected party trumps all . . . burdens.' [Citation.] On the other, if the danger presented is 'a few unwanted calls or letters or e-mail messages,' the court may weigh that danger against any burdens imposed by renewal." (*Ibid*.)

If, after considering these factors, the trial court "finds by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse," it should renew the DVRO. (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1290.)

We review a trial court's ruling on a request to renew a DVRO for abuse of discretion. (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.) " '[A]n abuse of discretion occurs where " ' "the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " ' " (*Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 509 (*Ashby*).) " 'But the question whether the trial court applied the correct legal standard in exercising its discretion is a question of law requiring de novo review. [Citation.] If the court's decision . . . is influenced by an erroneous understanding of the law, the court has not properly exercised its discretion under the law.' [Citation.] We presume that the court applied the correct legal standard in the absence of evidence to the contrary." (*G.G.*, *supra*, 102 Cal.App.5th at p. 421.) " 'It is the appellant's burden to affirmatively demonstrate error.' " (*Ashby*, at p. 509; see also *Jameson*, *supra*, 5 Cal.5th at p. 609.)

2. Analysis

We first review de novo V.K.'s assertion that the trial court applied the incorrect standard in evaluating V.S.'s request to renew the DVRO.

V.K. asserts that the trial court, by referring to the relevance of V.S.'s " 'subjective impression' " of the January 18 e-mail and to V.S.'s subjective beliefs and feelings, failed to apply the correct standard for evaluating a DVRO renewal request, which V.K. maintains is objective and based on the " 'reasonable woman in the same circumstances' " standard. We are not persuaded.

In making its ruling, the trial court stated, "What is relevant is the witness's subjective impression of the contents of the writing and whether it does or does not support a reasonable apprehension of future abuse." Under the standard articulated by *Ritchie*, the court must "determine whether [the protected person's] *expressed* fear of significant future abuse is reasonable and thus sufficient to warrant a permanent (or lengthy) extension of the original protective order." (*Ritchie, supra*, 115 Cal.App.4th at p. 1293, italics added.) The court therefore must consider the impact of the restrained person's actions on the protected person—i.e., "the witness's subjective impression" of the conduct. The court must then determine whether the restrained person's conduct would impact a reasonable person in the same circumstances (in other words, a reasonable person who has "experienced the abuse" suffered by the applicant) in the same way. (*Ritchie*, at p. 1288 [considering a reasonable person "in the same circumstances"]; *G.G., supra*, 102 Cal.App.5th at p. 427 [considering a reasonable person who has "experienced the abuse" perpetrated by the restrained person].)

We discern no error in the trial court's articulation of the standard. Further, although V.K. argues that there is evidence in the record that supports a finding that V.S.'s testimony is not credible, V.K. "fails to comprehend the barrier credibility findings present on appeal. We do not substitute our opinion as to the credibility of the witnesses for that of the

23

trial court.  [Citation.]  And we are bound to ' "resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order." ' " (*Rybolt, supra*, 20 Cal.App.5th at p. 876; see also *O.B., supra*, 9 Cal.5th at p. 1008.)

In addition, considering whether the protected person has "a reasonable apprehension" of future abuse necessarily implicates the person's beliefs and feelings.  The term "apprehension" is defined as "[p]erception; comprehension; belief" and, alternatively, "[f]ear and anxiety about the future, esp. about dealing with an unpleasant person or a difficult situation." (Black's Law Dict. (12th ed. 2024) p. 125, col. 2.)  Decisions following *Ritchie* have considered the protected person's beliefs and feelings in determining that he or she has met their evidentiary burden for renewal of a DVRO.  (See, e.g., *Navarro, supra*, 108 Cal.App.5th at pp. 235–236; *Ashby, supra*, 68 Cal.App.5th at p. 508; *Rybolt, supra*, 20 Cal.App.5th at p. 871; *Lister, supra*, 215 Cal.App.4th at pp. 325–326.)

In pronouncing its decision, the trial court "reiterate[d] [the] legal standard, which is that petitioner must establish by a preponderance of evidence that petitioner, the protected party, entertains a reasonable apprehension of future abuse.  No showing of further abuse since the original order is required."  After considering the evidence presented during the hearing, the court stated it had considered the factual bases supporting V.S.'s assertions, together with "the totality of the circumstances in evidence," to reach the conclusion that V.S. had "established by a preponderance of the evidence that she continues to entertain a reasonable apprehension of future abuse."  We disagree with V.K.'s assertion that the court applied an incorrect legal standard in evaluating the renewal request.  (*G.G., supra*, 102

24

Cal.App.5th at p. 427; *Ritchie, supra*, 115 Cal.App.4th at p. 1291; §§ 6301, subd. (d), 6320, subd. (c).)

We turn to V.K.'s contention that the trial court erred by declining to consider the impact of the renewal of the DVRO on V.K.'s career.

In her opening argument, V.K.'s counsel stated that renewal of the DVRO would affect his "future career. He is interested in teaching, so if we have a lifelong DVRO against him, whether it's evidence of him being violent or emotional or physical abuse, this will affect his future career and affect what he could earn to support [the child]." In response, the trial court stated that it would not hear evidence on whether the renewal of the DVRO would impact V.K.'s "professional aspirations" because it was "not a relevant issue."

V.K. asserts error on the ground that, "[w]hen considering a restraining order renewal based on non-physical abuse, the court *must* consider the burdens that a renewed restraining order would impose on the restrained party" and that the *Ritchie* decision "*explicitly requires*" consideration of such burdens. (Italics added.) (Citing *Ritchie, supra*, 115 Cal.App.4th at p. 1290.)

V.K. misreads *Ritchie*. The *Ritchie* court stated that "the 'burdens' the protective order imposes on the restrained party . . . *may or may not be* a relevant factor in the trial court's consideration of a contested request for renewal of a protective order." (*Ritchie, supra*, 115 Cal.App.4th at p. 1291, italics added.) Even if the existing DVRO focuses on nonphysical threats of violence, "the court *may* have to weigh the seriousness as well as the degree of the risk against the significance of the burdens the restrained party will experience if subjected to a continuing protective order." (*Id*. at p. 1292.) The trial court may, but need not, consider the third factor in a matter involving nonphysical abuse. (See *In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 299.) V.K. has not persuaded us that the court abused its

discretion in declining to consider the burden a DVRO renewal would have on him.

Substantial evidence in the record demonstrates that V.K. exhibited a pattern of threatening to withhold the child from V.S., sending V.S. "harassing and bullying" messages, and threatening her professionally and financially, both before the trial court issued the original DVRO and after it was issued (thereby violating the DVRO).

V.K. contends that changed circumstances weigh against renewal of the DVRO. Specifically, V.K. asserts that the parties have had "successful curbside exchanges for years," he is remarried and expecting a child, V.S. has not alleged physical abuse since the DVRO, he is "medication free," and V.S.'s "non-acknowledgment" of V.K.'s offer of a lifelong no contact order (in exchange for V.S.'s withdrawal of her renewal request) indicates she does not fear future abuse. We take these contentions in turn.

First, as discussed *ante*, the trial court found that V.K. has repeatedly violated the DVRO. V.K.'s asserted partial compliance with the DVRO does not "preclude[] a finding of reasonable apprehension." (*Ashby*, *supra*, 68 Cal.App.5th at pp. 515–516; *G.G.*, *supra*, 102 Cal.App.5th at p. 426.)

Second, the record contains no indication that V.K. presented in the trial court testimony or other evidence of his remarriage and new child, and V.K. cites no evidence in the record in support of his assertion. A reviewing court generally examines the correctness of a judgment or order based on a record of those matters that were before the trial court. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405; *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1102.) We therefore do not consider V.K.'s arguments based on his current family circumstances.

26

Third, whether V.S. has alleged *physical* abuse by V.K. since the DVRO does not undermine the evidence she presented in her DVRO renewal request. "The law does not permit courts to make a distinction between physical and nonphysical abuse when issuing DVROs. Nor is there any indication that courts should make such a distinction when deciding whether to renew them." (*G.G.*, *supra*, 102 Cal.App.5th at p. 425; *Rybolt*, *supra*, 20 Cal.App.5th at p. 875 ["Fear of physical abuse is not required to renew a restraining order. [Citation.] The [DVPA] covers a myriad of conduct beyond mere physical abuse."]; § 6203, subd. (b) ["Abuse is not limited to the actual infliction of physical injury or assault."]; see also *G.G.*, at p. 425 ["In keeping with the Legislature's determination to prevent all types of abuse, *Ritchie* makes no distinction between physical and non-physical abuse in the application of its first factor."].) "The original order could be issued based on reasonable fear of nonphysical abuse, and it can be renewed on the same basis." (*G.G.*, at p. 425.)

The record contains substantial evidence that V.K. violated the original DVRO by volunteering at the child's school (for the 2022–2023 school year), sending V.S. messages not pertaining to the child's visitation (in 2022 and 2023), threatening to withhold the child (in 2023), and threatening V.S.'s medical license (in 2024) even after he asserts he was medicine free (in 2022). Where "little has changed . . ., the need for the order continues." (*G.G.*, *supra*, 102 Cal.App.5th at p. 422.)

Finally, V.K. makes no cogent, factually supported, or legally supported argument why V.S.'s continued pursuit of renewal of the DVRO instead of agreeing to a lifelong no contact order means that she lacks reasonable apprehension of future abuse. (*S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

We decide the trial court did not abuse its discretion in granting V.S.'s DVRO renewal request.[11]

### III.  DISPOSITION

The trial court's May 17, 2024 order granting respondent V.S.'s request to renew the domestic violence restraining order against V.K. is affirmed. Respondent is entitled to her reasonable costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

---

[11] V.S. requests this court impose sanctions against V.K. on the basis that his appeal "lacks a genuine assessment of its likelihood of success or any reasonable grounds for reversal."  Because V.S. "failed to follow the proper procedure for requesting sanctions," we decline her request.  (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1273, fn. 10; *Kajima Engineering and Construction, Inc. v. Pacific Bell* (2002) 103 Cal.App.4th 1397, 1402 ["A party seeking sanctions on appeal must file a separate motion for sanctions that complies with the requirements of" the applicable rules.]; see also Cal. Rules of Court, rule 8.276(b)(1).)

_____
Danner, J.

WE CONCUR:


_____
Grover, Acting P. J.



_____
Lie, J.




**H052345**
***In re Marriage of V.S. and V.K.***